UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| In re: | ) | No. CV-05-333-AAM |
| | ) | |
| | ) | |
| FEATURE REALTY LITIGATION | ) | |
| | ) | ORDER DENYING USF&G'S |
| | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT RE: NO COVERAGE |
| | ) | FOR TORTIOUS |
| | ) | INTERFERENCE |
| | ) | |
| | ) | |

**THIS DOCUMENT RELATES TO:**

**CV-05-165-AAM; CV-05-222-AAM**

**BEFORE THE COURT** is Defendant United States Fidelity & Guaranty Company's ("USF&G") Motion for Summary Judgment Re: No Coverage for Tortious Interference (Ct. Rec. 61). The motion was noted without oral argument and is ripe for review. The Court has considered all pleadings, including the supplemental memoranda submitted upon request of the Court. The Court concludes the motion must be denied.

**I. STATEMENT OF FACTS**

**A.   *Procedural History***

The present insurance coverage dispute stems from litigation which began over ten years ago. Feature Realty, Inc. (Feature) is the owner and developer of a Planned Unit Development (PUD) formerly known as the Mission Spring PUD, currently known as the

**ORDER** - 1

Canyon Bluffs PUD.  In July 1995, Feature filed a cause of action (No. 95-2-03773-3) in Spokane County Superior Court against the City of Spokane (City) and various city employees alleging the City had wrongfully withheld a grading permit related to the PUD application.  Following a decision by the Washington State Supreme Court in *Mission Springs v. City of Spokane*, 134 Wn.2d 947, 954 P.2d 250 (1998), a settlement was eventually reached in October 1998. Ct. Rec. 1, Ex. A [Stipulated Settlement Agreement] in 03-CV-063-JLQ.  The stated purpose of the 1998 settlement agreement was in part "to establish the right of the Developer(s) to fully and completely develop the Canyon Bluffs Planned Unit Development..." *Id.* at 8.  The agreement not only resolved all claims, but provided a framework for future issues related to the development.  *Id.*  The City, however, repudiated the 1998 settlement agreement on the basis that it had not been approved in an open public meeting.

As a result, in November 2000, Feature filed another cause of action (No. 00-2-06812-8) in Spokane County Superior Court seeking to enforce the settlement agreement.  This action was subsequently removed to federal district court in December 2000.  See Ct. Rec. 1 in 00-CV-444-AAM.  Feature petitioned to remand and on August 30, 2001, this Court entered an order denying the petition and ultimately ruled the City had violated the Open Public Meetings Act (OPMA), rendering the 1998 settlement agreement null and void. Ct. Rec. 132 in 00-CV-444-AAM.  Final judgment was entered on October 30, 2001.  Ct. Rec. 147 in 00-CV-444-AAM.  The Ninth Circuit Court of Appeals affirmed that decision.  *Feature Realty, Inc. v. City of*

**ORDER** - 2

*Spokane*, 331 F.3d 1082 (9th Cir. 2003).  Feature then moved to re-open the Spokane County Superior Court action it had filed in July 1995 and the Spokane County Superior Court granted the motion.

In January 2003, Feature filed another action (No. 03-2-00670-4) in Spokane County Superior Court against the City, alleging the City had improperly delayed approval of a plat amendment for the Canyon Bluffs PUD.  The City removed the action to federal court (CV-03-063-JLQ) and on May 6, 2003, the Honorable Justin L. Quackenbush denied Feature's motion to remand because federal question jurisdiction existed by virtue of a 42 U.S.C. § 1983 claim asserted by Feature.  Judge Quackenbush later granted Feature's motion to file a "Second Amended Complaint" which dropped the § 1983 claim and deprived the Court of federal question jurisdiction. The action was then remanded to Spokane County Superior Court.

Following remand, Feature's 2003 action (No. 03-2-00670-4) was consolidated with its 1995 action (No. 95-2-03773-3). Feature filed a "Third Amended Complaint" in October 2003 alleging three causes of action against the City: one under 42 U.S.C. § 1983, one under RCW 64.40, and one under the common law tort theory of intentional interference with business expectancy.  Following several mediations and months of negotiations, the parties stipulated to a settlement agreement signed April 18, 2005 (the 2005 settlement) and agreed to the entry of judgment resolving the cases (see further discussion below).

Following the 2005 settlement, Feature filed motions in Spokane County Superior Court to determine the reasonableness of

**ORDER** - 3

the covenant judgment amount; for entry of judgment against the
City; to dismiss individuals named as defendants in 03-2-00670-4;
and for leave to amend the complaint to name two of the City's
insurers, Genesis Insurance Company (Genesis) and USF&G, as
additional defendants and plead four causes of action against them
including equitable indemnity, recovery under the Consumer
Protection Act, breach of insurance contracts, and bad faith in
handling the insurance claims.  These motions were served on
Genesis and USF&G, along with a proposed judgment against the City
and a proposed "Fourth Amended Complaint" which would add Genesis
and USF&G as defendants.  A hearing was held on June 10, 2005 in
Spokane County Superior Court at which counsel for USF&G and
Genesis appeared, although USF&G and Genesis were denied leave to
formally intervene in the matter.  The court found the covenant
judgment reasonable, entered judgment against the City, and granted
Feature leave to file the "Fourth Amended Complaint" which sought
to collect on the judgment.

The aforementioned "Fourth Amended Complaint" was then removed
to this court as CV-05-222-AAM based on diversity of citizenship.
Previous to this removal, and indeed previous to the Spokane County
Superior Court granting Feature leave to file the "Fourth Amended
Complaint," both USF&G and Genesis filed declaratory judgment
actions in this Court (CV-05-165-AAM filed by USF&G on June 1,
2005; CV-05-168-AAM filed by Genesis on June 2, 2005), seeking
declarations that they were not obligated to pay anything to the
defendants under the terms of their respective insurance policies

**ORDER** - 4

with the City of Spokane. Cause numbers 05-165, 05-168 and 05-222 were consolidated under a single case number (05-333).[1]

On March 7, 2006, this Court granted partial summary judgment to USF&G, declaring USF&G's insurance policy did not cover Feature's RCW 64.40 claim which had been settled with the City. The Court denied that portion of USF&G's motion relating to the claim for intentional interference with business expectancy, finding that Washington public policy and the USF&G insurance policy at issue did not preclude Feature from seeking recovery on that claim.

**B.    *The Underlying Action against the City***

The following is a brief summary of the allegations made by Feature in its underlying lawsuit against the City of Spokane which eventually settled in 2005. In planning the development of the Canyon Bluffs development project, Feature sought to convert several previously planned multi-family lots into single family lots. Cordell Decl., Ct. Rec. 80, Ex. A [Third Amended Complaint]. This change required revising the previously approved 1992 PUD plat/plan which, in turn, required the City's approval. Feature could not obtain the construction permits necessary to commence construction on the Canyon Bluffs project until a final plat was approved.

---

[1] Genesis subsequently settled all of the claims brought against it in 05-165 and 05-222, and the claims asserted by it in 05-168. (Ct. Rec. 41).

**ORDER** - 5

The revision of the plat was a concept alleged by Feature to have been contemplated during the negotiation of the 1998 settlement agreement. *Id*. The 1998 settlement agreement had provided that upon written request, the City would "immediately issue all permits and all necessary approvals required for Phase I of the [Canyon Bluffs] P.U.D.... ." Ct. Rec. 1, Ex. A [Stipulated Settlement Agreement] at 9 in 03-CV-063-JLQ. In addition, the agreement provided a procedure for expediting the permitting process and indicated that "time is of the essence in this Agreement." *Id.* at 15. With these terms in mind, on May 19, 1999, Feature (through project engineer Taylor Engineering) lodged with the City's Planning Department an amended plat/plan for the Phase I development of the Canyon Bluffs PUD, along with an engineers' certification. *Id.* By May 2000, the City had neither approved nor rejected the plat/plan amendment. Feature claimed that upon inquiry to the City regarding the status of the amendment, the City advised Feature that it could not locate the May 1999 submission. Patterson Decl., Ct. Rec. 65, Ex. 17 [Declaration of Mark Aronson in Support of Motion to Determine Reasonableness of Covenant Judgment] at 95. Feature alleged that in June 2000, the City nevertheless advised that it would not process the PUD/plat amendment pursuant to the terms of the 1998 settlement agreement. Instead of viewing the submission as an amendment of the earlier approved plat, the City believed it should be viewed as a new plat application, requiring a public hearing for approval and further impact studies. *Id.* at 99. On October 3, 2000, Feature filed a

**ORDER** – 6

formal application for the plat amendment.  After a public hearing in May 2001, the final plat for the Canyon Bluffs project was not approved and recorded until December 30, 2002.  USF&G Statement of Material Fact, Ct. Rec 63 at ¶ *19*.

Feature's "Third Amended Complaint" against the City (filed in Spokane County Superior Court Cause No. 03-2-00670-4) alleged that City officials had intentionally stalled work on Feature's application and unlawfully delayed the processing of the application.  Cordell Decl., Ct. Rec. 80, Ex. A [Third Amended Complaint].  Feature alleged the City had committed the tort of interference with a business expectancy and violated 42 U.S.C §1983 and RCW 64.40.  *Id.*  At the reasonableness hearing following the 2005 settlement, Feature explained the basis of its claims.  It asserted that it had experienced inordinate delays in the processing of nearly all of its submissions related to the plat/plan application.  Feature complained specifically about the delay associated with the City's handling of the water plan approval.  Patterson Decl., Ct. Rec. 65, Ex 16 [Points and Authorities in Support of Reasonableness]; *Id*. at Ex 17 [Declaration of Mark Aronson in Support of Motion to Determine Reasonableness of Covenant Judgment](Aronson Decl); *Id* at Ex. 18 [Declaration of C. Blaine Morley in Support of Motion for Reasonableness Hearing].  Until November 25, 2002, final approval of a water system had been a condition of the Planning Department's approval of the plat amendment application.  Patterson Decl., Ct. Rec. 65, Ex. 13 [Letter dated November 25, 2002] at 47; Ex. 17

**ORDER** – 7

[Aronson Decl.] at 98. The City had already approved a water system in 1999. Morley Decl., Ct. Rec. 79, Ex. D [Spokane Fire Appeals Board Findings] at 51-52. Since the approvals do not last indefinitely, Feature's engineers requested an extension of this approval in the fall of 2000. *Id.* Feature claimed the City never responded to this request. Patterson Decl., Ct. Rec. 65, Ex 17 [Aronson Decl.] at 97. Accordingly, in November 2001, Feature resubmitted the water plans for approval. *Id.* The City responded to the submission in April 2002 indicating it would not approve the water plan until it complied with revised design standards, as mandated by the Fire and Water Departments. *Id.* Feature appealed this decision to the Spokane Fire Appeals Board which ruled on February 4, 2003 that the City should honor its prior approval granted in 1999. Morley Decl., Ct. Rec. 79, Ex. D [Spokane Fire Appeals Board Findings] at 53. The City then filed a land use petition appealing the decision of the board. *Id.*, Ex. E [City Counsel Resolution] at 54. The appeal was eventually settled in March 2003. *Id.* at 54-55. The City did not finally approve the water plan until mid-December 2003. Patterson Decl., Ct. Rec. 65, Ex 17 [Aronson Decl.] at 98.

According to Feature, further delay was caused by the City's requirement that the City Attorney's Office oversee the approval of the application and by the City's two requests for reconsideration of the Hearing Examiner's May 29, 2001 decision. *Id.* at 98-99. Feature also alleged that from October 3, 2000 until April 2001, the City intentionally stalled in certifying its plat application

**ORDER** - 8

1  as complete which was necessary for the public hearing to take
2  place. *Id.*

3  **C.    *The Settlement***

4       In April 2005, without USF&G's participation, the City and
5  Feature settled the consolidated state court action (Nos. 95-2-
6  03773-3 and 03-2-00670-4).    The terms of the 2005 settlement
7  agreement were: 1) The City stipulated to a judgment in favor of
8  Feature and against the City in the amount of $5.5 million dollars;
9  2) The City assigned its insurance rights under the policies issued
10 by Genesis and USF&G as those policies applied to the stipulated
11 judgment; 3) Feature agreed that satisfaction of the award of $5.5
12 million dollars against the City would be solely by recourse
13 against Genesis and USF&G pursuant to the assignment of rights; and
14 4) Feature received $600,000 from Lexington Insurance Company
15 (another of the City's liability insurers) and that company
16 assigned to Feature its equitable contribution claims against
17 Genesis and USF&G. Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 3
18 [2005 Settlement Agreement].

19      The Covenant Judgment entered by the Spokane County Superior
20 Court pursuant to the settlement agreement stated in pertinent
21 part:

22      The parties have agreed that this Judgment determines only the
        liability of the Judgment Debtor for any liability it may have
23      for the alleged wrongful acts of Judgment Debtor from and
        after May 19, 1999, related to the alleged delays in the
24      processing of the application for a Plat Amendment for the
        Canyon Bluffs PUD, formerly known as the Mission Springs PUD;
25      but all other liability of the Judgement Debtor that may
        otherwise exist by virtue of the allegations stated in the
26      Third Amended Complaint...are deemed merged into this Judgment

27

**ORDER** – 9

for purposes of determining and resolving the liability of the Judgment Debtor.

Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 2 [Covenant Judgment].

**D.    *The Insurance Policy***

USF&G issued the City an excess liability insurance policy with a policy period commencing on September 1, 1999 and expiring on September 1, 2002.  Cordell Decl., Ct. Rec. 80, Ex. B at 17. The policy's insuring clause provides as follows:

> Coverage A. We will pay 'ultimate net loss' on behalf of any insured (including the 'Public Entity') in excess of the 'self-insured retention' for any civil claim because of injury caused by a 'wrongful act' to which this insurance applies.

> Coverage B.  We will indemnify the 'Public Entity' for 'ultimate net loss' for which the 'Public Entity' shall be required by law to indemnify any other insured for any civil claim made against such other insured because of injury caused by a 'wrongful act' to which this insurance applies.

> Coverages A. and B. Only apply if the 'wrongful act' was committed in the coverage territory during the policy period.

*Id.* at 18.  "Wrongful act" is defined by the policy as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including misfeasance, malfeasance and nonfeasance by any insured..."  *Id.* at 30.

**II. SUMMARY JUDGMENT STANDARD AND BURDENS OF PROOF**

A determination of whether a particular loss is within the coverage of an insurance policy is a question of law which may be decided on a motion for summary judgment.  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

**ORDER** - 10

as a matter of law." Fed.R.Civ.P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the movant, the burden initially lies with USF&G to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). The nonmoving party must then go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. In deciding whether there is a disputed issue of material fact, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The present case concerns the extent of USF&G's duty to indemnify Feature pursuant to the City of Spokane's insurance policy with USF&G. The duty to indemnify can only be triggered if coverage actually exists. It is well-settled that, in the context of insurance litigation, the insured (or in this case, assignee of the insured) has the ultimate burden of establishing that the underlying claims resolved pursuant to the settlement fall within the coverage of the insurance policy. *McDonald v. State Farm Fire*

**ORDER** - 11

& *Cas. Co.*, 119 Wash.2d 724, 730, 837 P.2d 1000 (1992); *Estate of Jordan v. Hartford Acc. & Indem. Co.,* 120 Wash.2d 490, 495, 844 P.2d 403 (1993) ("An assignee steps into the shoes of the assignor and has all the rights of the assignor"). However, as the movant herein, USF&G bears the burden of coming forward with proof to establish that the loss sustained by Feature and addressed in the 2005 settlement with the City was not within the policy coverage.

### III. DISCUSSION

**A.    *Introduction***

USF&G argues that Feature cannot demonstrate that its interference with business expectancy claim, which was settled with the City, is covered by the insurance policy issued by USF&G. Specifically, USF&G contends that it is not responsible for any portion of the settlement as no wrongful acts were committed during the policy period, a necessary condition to coverage. To decide this issue, it is necessary to analyze the relevant insurance policy provisions and apply them to the facts that constituted the basis for the settlement of Feature's underlying action against the City. Because the parties did not perform this critical analysis in their initial round of briefing, the Court  requested the parties submit supplemental pleadings. The parties' supplemental memoranda have raised new related issues. Specifically, the Court must consider whether questions of fact exist regarding:  1) what acts formed the basis of the interference claim at the time of settlement; 2) whether these acts qualify as "wrongful acts" under

**ORDER** - 12

the insurance policy; and 3) whether these acts occurred during the policy period.

**B.    *Trigger of Coverage***

The first step in any coverage analysis is determining what event must occur for potential coverage to commence under the terms of the insurance policy.  The operative event implicating coverage is also known as the "trigger" of coverage.  The issue is largely one of timing:  what must take place within the policy's effective dates for the potential of coverage to be 'triggered'? A policy that has not been triggered does not provide any coverage, while a policy that has been triggered may or may not provide coverage. Whether coverage is ultimately established in any given case may depend on the consideration of many additional factors, including the existence of express conditions or exclusions in the particular insurance policy,  the availability of certain defenses that might defeat coverage, and a determination of whether the facts of the case will support a finding of coverage.  The determination of the trigger of coverage depends on the policy language, rather than the type of injury alleged or the theory of liability pled.

*1. Rules for Interpreting Insurance Policies*

The general rules for interpreting the language of an insurance policy are well-settled.  Under Washington law, the Court must construe an insurance policy "as a whole," giving "a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 575, 964 P.2d 1173 (1998).

**ORDER** – 13

Coverage is determined by the plain meaning of the policy terms; defined words are interpreted in accordance with their definitions, while undefined terms are given their ordinary meaning. *Id*. at 576. Where policy language remains clear and unambiguous, the Court will enforce the provisions as written and not modify the policy or create ambiguity where none exists. *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.,* 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). Ambiguity exists if the policy is susceptible to more than one reasonable interpretation. *Transcon. Ins. Co. v. Wash. Pub. Util. Dists'. Util. Sys.*, 111 Wn.2d 452, 456-57, 760 P.2d 337 (1988). An ambiguous provision must be construed in favor of the insured. *Id.* at 457.

    *2. The Insurance Policy Language*

    Here, the language of the policy is unambiguous and must be understood in its ordinary meaning. *See Travelers Ins. Co. v. National Union Fire Ins. Co., Inc.*, 255 Cal.Rptr. 727, 732 (Cal.Ct.App. 1989). The policy provides coverage for "'ultimate net loss' in excess of the 'self-insured retention'" for any civil claim because of "injury caused by a 'wrongful act' to which this insurance applies." Cordell Decl., Ct. Rec. 80, Ex. B at 17. Coverage applies only if "the 'wrongful act' was committed in the 'coverage territory' during the policy period." *Id.* "Wrongful act" is defined as:

> [A]ny actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including misfeasance, malfeasance and nonfeasance by any insured...

*Id.* at 30.

**ORDER** - 14

According to the plain meaning of this language, only wrongful acts occurring during the policy period can trigger coverage.[2] *Pub. Util. Dist. No. 1*, 124 Wn.2d at 801.  USF&G issued the City an insurance policy with a policy period of September 1, 1999 to September 1, 2002.  Accordingly, in this case, coverage can only exist if Feature can demonstrate sufficient facts to show the

---

[2] The two most common types of liability insurance policies are "occurrence" policies and "claims made" policies.  A "claims made" policy is one whereby the carrier agrees to assume liability for any errors, including those made prior to the inception of the policy as long as a claim is made during the policy period. On the other hand, an "occurrence" policy provides coverage for any acts or omissions that arise during the policy period even tough the claim is made after the policy has expired. "Wrongful act" policies, such as the policy here, are sometimes viewed as a type of occurrence policy.  The Court is however mindful that an insurer's contractual obligations must be judged by the language of the policy itself, and not according to blanket rules of coverage which are not necessarily responsive to the wording of this policy.  *See Travelers Ins. Co. v National Union Fire Ins. Co.,* 207 Cal App 3d 1390, 1395-97, 255 Cal. Rptr. 727 (1st Dist. 1989). This is important because customarily, in occurrence policies, the timing of the act or omission causing the damage is largely immaterial to establishing coverage because coverage is ordinarily triggered by the time when the complaining party is actually damaged. This is not the case here.

**ORDER** - 15

settled claim was based upon a "wrongful act" occurring between September 1, 1999 and September 1, 2002.

C.    *The 2005 Settlement*

The existence of coverage and the duty to indemnify depends on the true state of facts surrounding the underlying loss or injury.[3] *Northwest Pump & Equip. Co. v. American States Ins. Co.*, 144 Or.App. 222, 227, 925 P.2d 1241 (1996).  Usually, such facts are established at trial.  *American Motorists Insurance Co. v. General Host Corporation*, 946 F.2d 1482, 1488 (10th Cir. 1991).  However, where the claims have been settled, the insurer's obligation to pay and the determination of coverage must be based upon the facts inherent in the settlement and, because this is a summary judgment proceeding, the undisputed facts.  *Travelers Ins. Co. v. Waltham Indus. Labs. Corp.*, 883 F.2d 1092, 1099-1100 (1st Cir. 1989) (stating that duty to indemnify is determined on the basis of the settlement and the undisputed facts, and remanding to resolve dispute over whether facts established that claim fell within policy exclusion); *Celotex Corp. v. AIU Ins. Co.*, 152 B.R. 661 (Bankr.M.D.Fla. 1993) ("[W]hereas the duty to defend is measured by the allegations of the underlying complaint, the duty to indemnify is measured by the facts as they unfold at trial or are inherent in the settlement agreement").

In the case *sub judice*, as there was never a formal adjudication of the underlying settled claims, there are no formal

---

[3] By contrast, the duty to defend is determined by the allegations of the underlying complaint.

**ORDER** - 16

findings of fact for the Court to consider.  The following have been made a part of the record and are useful evidence of Feature's claims and settlement:

1) Feature and the City's Settlement Agreement, signed in April 2005 (Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 3 at 17);

2) Feature's Memorandum of Points and Authorities in Support of Motion to Amend Second Amended Complaint and for Leave to File Third Amended Complaint, dated October 7, 2003 (Suppl. Decl. Of Patterson, Ct. Rec. 104, Ex. 4 at 51);

3) The Third Amended Complaint (Cordell Decl., Ct. Rec. 80, Ex. A);

4) Feature's Mediation Brief dated July 22, 2004 (Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 1 at 4);

5) Peter Schulman (Feature's expert) Expert Report dated June 11, 2004 (Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 6 at 61);

6) Feature's Memorandum of Points and Authorities in Support of Motions dated May 26, 2005 (Patterson Decl., Ct. Rec. 65, Ex. 16 at 72);

7) Declaration of C. Blaine Morley in Support of Motion to Amend, Reasonableness Hearing, Etc. dated May 26, 2005 (Patterson Decl., Ct. Rec. 65 at 106);

8) Excerpts from Feature's Response to Defendants' Seventh Discovery Request dated March 5, 2004 (Patterson Decl., Ct. Rec. 65, Ex. 15);

9) Covenant Judgment Pursuant to Written Stipulation dated May 27, 2006 (Suppl. Decl. of Patterson, Ct. Rec. 104, Ex. 2 at 17).

The 2005 Settlement Agreement does not finally establish or determine any facts.  The Court has accordingly considered all of the evidence supplied by the parties which could shed light on the underpinnings of the settlement with the City.

1.   *Interference Claim was Included in Settlement*

First, the Court will address USF&G's latest contention that the intentional interference claim was not "'inherent' in the settlement at all" as it had "no existence separate and apart" from Feature's claim under RCW 64.40, which the Court has already ruled is not a covered claim.  USF&G's Supplemental Brief, Ct. Rec. 104

**ORDER** – 17

at 13.   The Court must address this argument first because the existence of coverage depends on what claims were settled. Feature, of course, can only recover damages for claims which were part of the 2005 settlement.

The Court need not look any further than the language of the 2005 Settlement Agreement and Feature's "Third Amended Complaint" (in Spokane County Superior Court Cause No. 03-2-00670-4) to conclude it is undeniable that Feature's tortious interference claim was both a separate claim and an inherent part of the 2005 settlement.  Feature's interference claim was a separate theory of liability alleged in the "Third Amended Complaint" pending at the time of the 2005 settlement.  Supp. Decl. of Patterson, Ct. Rec. 104, Ex. 4 at 26( ¶F).  The 2005 settlement agreement expressly states that the agreement settles "the Action", which is defined as the claims then pending before the Superior Court. Supp. Decl. of Patterson, Ct. Rec. 104, Ex. 4 at 27 (¶I.A.), 29(¶ II.A.).  The agreement also states it is the parties' "desire to avoid the continuing cost of discovery and trial" and to settle "the claims of liability against the Defendants on the remaining claims by settlement of the *entire* dispute." *Id.* at ¶ H (emphasis added). Finally, the 2005 settlement agreement provides that "all liability of the [City] arising out of or related to the allegations stated in the Third Amended Complaint on file in the Action, shall be deemed merged into the Covenant Judgment..."  Supp. Decl. of Patterson, Ex. 4 at 31.  Contrary to USF&G's contention, the 2005 settlement agreement was not solely premised upon the statutory

**ORDER** - 18

claim (RCW 64.40) as it indeed covered Feature's cause of action for intentional interference with a business expectancy. That both settled claims were based upon coextensive facts and damages does not affect this conclusion.[4]

> *2.  The Facts Forming the Basis of the Settlement; The City's Refusal to Summarily Approve the Plat Amendment was not the Sole Factual Premise of the Settlement*

As stated above, the Court must analyze the facts that constituted the basis for the 2005 settlement to determine whether

---

[4] The analysis of the duty to indemnify can be divided into several steps, the first of which is always the trigger of coverage. The next step is the analysis of the *extent* of coverage under the policy. USF&G's contention that the settlement was exclusively premised on the non-covered statutory claim also raises a "second step" question, specifically, the question of how the settlement allocated liability between the statutory claim and the interference claim. The settlement agreement does not indicate how liability was allocated. *See Perdue Farms, Inc. v. Travelers Cas. and Surety Co. Of America,* 448 F.3d 252, 263 (4th Cir. 2006). The issue of allocation of liability has not been argued or briefed by the parties. Accordingly, if it is determined that coverage is triggered, the *extent, if any,* of USF&G's duty to indemnify is an issue which remains. *Raychem Corp v. Federal Insurance Co.,* 853 F.Supp. 1170, 1176 (N.D. Cal 1994).

**ORDER** - 19

the settlement of the interference claim is potentially covered by the excess liability insurance policy. *Waltham Indus. Laboratories Corp.*, 883 F.2d at 1099; *Employers Reinsurance Corp. v. Newcap Ins. Co., Ltd.,* 209 F.Supp.2d 1184 (D.Kan. 2002). USF&G contends that the only act upon which the 2005 settlement was based was the City's failure to summarily approve Feature's amended PUD/plat application pursuant to the terms of the 1998 settlement agreement. USF&G claims this act occurred on May 29, 1999 (10 days after Feature lodged the amendment with the City). Because the insurance policy only covers wrongful acts occurring between September 1999 and September 2002, USF&G maintains the interference claim is not covered by the policy. Feature disagrees with USF&G's characterization of the factual basis of its claims and the settlement. The Court agrees with Feature and finds the record does not support USF&G's position.

The undisputed facts show that Feature's interference claim and the underlying 2005 settlement were based upon the alleged wrongful delays caused by the City's action or inaction in the processing of the plat amendment. It is undisputed that the City's failure to timely act upon Feature's May 1999 submission was one act which Feature had specifically complained was wrongful and a cause of delay. All of the evidence of record, however, demonstrates the factual basis of Feature's interference claim went far beyond just this single omission. The Covenant Judgment itself states:

> The parties have agreed that this Judgment determines only the liability of the [City] for any liability it may have for the

**ORDER** – 20

> alleged wrongful acts of the [City] from and after May 19, 1999, related to the alleged delays in processing of the application for a Plat Amendment for the Canyon Bluffs PUD...

Supp. Decl. of Patterson, Ct. Rec. 104 at 19 (emphasis added). While it is true the specific acts related to the alleged delays were not spelled out in the Covenant Judgment, the Court notes the Judgment refers to the plural "alleged wrongful *acts"* and "alleged *delays",* rather than referring to a single act related to a single delay. Both Feature's "Motion for Leave to file the Third Amended Complaint" and the "Third Amended Complaint" itself identified the basis of Feature's interference claim as the City's alleged failure and/or refusal to act on Feature's May 19, 1999 amended plat application until June 2000, as well as the City's alleged continued refusal to timely process and approve the application until December 30, 2002.[5]  Supp. Decl. of Patterson, Ct. Rec. 104, Ex.

4 at 53; Cordell Decl., Ct. Rec. 80, Ex. B at 4.

---

[5] The allegations in the complaint are not always necessarily determinative in every coverage dispute. *See e.g. Employers Reinsurance Corp. v. Newcap. Co., Ltd.,* 209 F.Supp.2d 1184 (D.Kan. 2002)(finding that the facts as they existed when the lawsuit was settled are determinative).  However, some courts have held that "[a]fter settlement, the underlying claimants' liability contentions are accepted as true for purposes of determining whether there is coverage." *Rozenfeld v. Medical Protective Co.,* 73 F.3d 154, 158 (7th Cir. 1996).

**ORDER** – 21

The delays associated with the processing of the plat amendment alleged by Feature were numerous.  Its pleadings specifically referred to: 1) the time from May 19, 1999 when Feature's plat amendment was first submitted to the City until June 2000 when the City responded by notifying Feature it needed to file a new plat amendment application; 2) the additional time associated with having to file a new plat amendment and go through a public hearing; 3) the time from after the formal hearing on May 29, 2001 until December 30, 2002 when the application was approved; and 4) the time from November 2001 until December 2002 for the water plan approval.  Patterson Decl., Ct. Rec. 65, Ex. 16 [Feature's Memorandum of Points and Authorities in Support of Motions dated May 26, 2005] at 77-80; Suppl. Patterson Decl., Ct. Rec. 104, Ex. 1 [Feature's Mediation Brief dated July 22, 2004] at 12.

A more detailed description of the various acts and omissions of individual City officials alleged by Feature to have contributed to these delays and the overall delay in the approval of the plat amendment application are set out in the excerpts provided in Feature's "Response to defendant's Seventh Discovery Request" dated March 5, 2004 (Patterson Decl., Ct. Rec. 65, Ex. 15) and Feature's July 22, 2004 Mediation Brief (Patterson Decl., Ct. Rec. 104) (describing "the delays it...suffered in getting the Project to a point that it can now build," "delays caused by the City which started on June 22, 1995 and continued unabated until December 14, 2003").  The alleged acts related to the alleged delays include acts which Feature claims caused a greater administrative

**ORDER** – 22

processing burden than usual, such as requiring that Feature's amendment be treated as a new application, therefore necessitating a public hearing, and subjecting the application to more onerous review and standards.   Other acts of delay alleged include the City's failure to respond to requests regarding the amendment application and the failure to timely process Feature's submissions.  *Id.*

Importantly, at the time just *following* the 2005 settlement, Feature's allegations remained the same.   As stated in its memorandum submitted to the Superior Court in conjunction with the reasonableness hearing:

> The settlement also settles the claims against the City for the liability alleged in the Second and Third Causes of Action of the Third Amended Complaint for delays from and after May 19, 1999, the date on which Plaintiffs caused an amended plat/plan to be delivered to the City for approval, *through December 30, 2002, the date on which the amendment was finally approved and the plat recorded*.

Patterson Decl., Ct. Rec. 65, Ex. 16 at 77 (emphasis added). Finally, the damages calculation performed by Feature's expert was based upon the perceived consequences of the alleged wrongful delays from May 19, 1999 until December 2002.   *Id*. at 80 (explaining that as a consequence of the City's conduct, the start of Project construction was delayed until May 2004); Suppl. Decl. Of Patterson, Schulman Expert Report, Ct. Rec. 104 at 61-83.

The Court concludes there are no genuine issues of material fact regarding the factual basis of the settlement.   The evidence of record evidence establishes the basis of Feature's interference claim at the time of the 2005 settlement was not merely the City's

**ORDER** – 23

refusal to act in May 1999. Rather, the settlement was premised upon the City's alleged acts related to the alleged delays in the processing of Feature's plat amendment beginning in May 1999 and continuing until December 2002.

D. *Coverage*

    1. *"Wrongful Acts"*

The insuring clause of the USF&G policy states that the insurer shall be required to indemnify for any civil claim made against the insured because of injury caused by any "wrongful act" committed in the coverage territory during the policy period. Cordell Decl., Ct. Rec. 80, Ex. B at 18. The issue is whether the alleged acts which formed the basis of the settlement constitute "wrongful acts" under the policy.

Despite having attempted to clarify this issue for the parties and having indeed specifically directed the parties to provide supplemental briefing with a focus on the application of the facts to the language of the insurance policy, neither party heeded this Court's instruction. Without a single mention of the language utilized in the policy itself, USF&G has continued on its course of arguing that Feature cannot demonstrate that any of the alleged acts were "wrongful" because it cannot "provide legal authority" that "the City had a legal duty" to act any other way. USF&G's Rebuttal Brief, Ct. Rec. 106 at 1; USF&G's Supplemental Brief, Ct. Rec. 104 at 11 ("There is nothing 'wrongful' about this exchange because, under SMC 11.02.03608 and SMC 11.19.362, the City was required to conduct this review."). USF&G's central argument is

**ORDER** – 24

that the City did nothing "wrongful" because "no legal duty can arise from an agreement that was void." USF&G's Rebuttal Brief, Ct. Rec. 106 at 2. Feature has similarly completely ignored the policy's definition of "wrongful act" and instead argued its position from the standpoint of "vested rights." Suppl. Brief of Feature, Ct. Rec. 102 at 5. The parties have made no attempt to tie their arguments to the definition of "wrongful act" as expressed in the insurance policy.

The parties misunderstand the proper framework of this coverage dispute. It is irrelevant whether the City's actions or the alleged delays were unlawful or justified. It is irrelevant whether Feature's interference claim had any legal merit. See *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wash.2d 789, 881 P.2d 1020, 1032 (1994) (stating that the insured need not prove the validity of the claims, but need only show that the claims were within the scope of policy coverage). The City's liability on Feature's claims has been resolved pursuant to the 2005 settlement agreement. Had USF&G wished to contest liability, it could have opted to participate in the underlying case and settlement negotiations. It opted not to defend on liability and instead chose to defend this case on the question of coverage and reasonableness. Accordingly, USF&G bears the risk that its coverage decision is wrong and it will be liable for a judgment in a case in which it did not participate, and in which it perhaps

**ORDER** – 25

feels its insured had meritorious defenses.[6]   USF&G cannot now elect to challenge liability under the guise of a coverage defense.

The need to discuss whether the City's acts qualify as "wrongful" is solely occasioned by the precise language used in this insurance policy to define the trigger of coverage which neither party has opted to interpret.   The insurance policy's definition of "wrongful act" includes "*any actual* or *alleged*" "error", "misstatement", "misleading statement", "act or omission", "neglect" and "breach of duty."   Cordell Decl., Ct. Rec. 80, Ex. B at 30 (emphasis added).   This is an extremely expansive definition of that term.   By its own terms, a "wrongful act" encompasses more than just negligent conduct.   *See Alexander v. CNA Insurance Co.*, 441 Pa. Super. 507, 512-13, 657 A.2d 1282, 1285 (1995) (liberally construing a comparable definition of "wrongful acts" and holding that board members charged with breach of contract were entitled to coverage since wrongful acts were defined as being any neglect of duty by the insureds in discharge of their duties), *app. denied*, 543 Pa. 689, 670 A.2d 139 (1995).   Moreover, even *allegations* of wrongful acts constitute "wrongful acts" under this policy definition.

The Court applies the language as written. According to the plain meaning of the language of the policy, the alleged acts and omissions of the City related to the alleged delays, which formed

---

[6] The Court recognizes the relative strength of the City's defenses would be a legitimate consideration to the question of reasonableness.

**ORDER** – 26

the basis of the 2005 settlement, qualify as "wrongful acts" under the policy. Nothing in the policy's definition of that term suggests it would not include coverage for the alleged acts of interference forming the basis of the settlement and Feature's claim for interference with a business expectancy.

   2. *A Wrongful Act Committed During the Policy Period*

   The parties do not appear to disagree that according to the plain language of the insurance policy, coverage can only exist if Feature can demonstrate a "wrongful act" occurred during the policy period. USF&G's main argument is that Feature cannot demonstrate a "wrongful act" occurred during the policy period. It is USF&G's position that if a "wrongful act" occurred, then it occurred in May 1999, before the effective date of insurance coverage. It is Feature's argument that the City's wrongful acts of delay in the processing of the plat amendment application were ongoing and continued unabated into the period covered by the insurance policy. Feature views the alleged acts of delay which formed the basis of its interference claim as having occurred on a repeated and continuous basis. Feature argues that although some pre-policy delay occurred, the delay continued to occur well into the policy period.

   Thus, the crux of the motion before the Court rests on the determination of the date on which the "wrongful act(s)" occurred. This raises these related questions: 1) For purposes of coverage, are the City's alleged acts of delay to be treated as a single fixed ascertainable "wrongful act," or a single continuing

**ORDER** – 27

"wrongful act," or a series of discrete "wrongful acts"?; and 2) Is there a single or continuous trigger of coverage?  It is not uncommon for the proper resolution of a coverage issue in any given case to turn on the number of triggers and their timing.  Neither party has provided any authority or discussion directly addressing this issue.  The Court therefore conducts its own analysis.

        *a.  Number of Acts*

Although Feature alleged and settled only a single claim for interference, Feature contends the City's delay in the processing of its permit application constituted a continuous course of wrongful acts causing the interference.  According to Feature, this course of conduct (covered by the 2005 settlement) began in May 1999 and continued until 2003, or until the permit was issued. Alternatively, Feature's interference claim could be based upon a series of discrete acts or omissions resulting in the alleged unreasonable delay.  However, regardless of whether the City's alleged acts are viewed as one continuous "wrongful act" or a series of discrete related acts of delay, the language of the USF&G policy collapses these acts into a single act.  Although neither party even referenced this provision of the policy, the Court finds it worth noting here.  Under the "Limits of Insurance" section, the policy states: "All claims or 'suits' for 'ultimate net loss' arising out of the same 'wrongful act' or series of continuous, repeated or interrelated 'wrongful acts' will be construed as arising out of one 'wrongful act'."  Cordell Decl., Ct. Rec. 80, Ex. B at 22. The Court does not believe the parties would disagree

**ORDER** – 28

1   that all of the City's alleged acts of delay or acts resulting in

2   delay qualify as a series of continuous or repeated acts related by

3   common facts and circumstances.  Under the language of this policy,

4   these alleged wrongful acts are to be treated as "arising out of"

5   a single wrongful act.

6          b.   *Timing of the Wrongful Act*

7          This provision however does not answer the question of *when*

8   the "wrongful act" should be deemed to have taken place.  It is not

9   uncommon for this type of policy provision to include a further

10  clause, also referred to as a "deemer clause," providing that a

11  single wrongful act shall be deemed to have taken place on the date

12  of the initial wrongful act.  *See e.g., Continental Ins. Co. v.*

13  *Metro-Goldwyn-Mayer, Inc*. 107 F.3d 1344 (9th Cir. 1997).  This sort

14  of language is noticeably absent here. The only reference to the

15  timing of wrongful acts is in the next provision in the "Limits of

16  Insurance" section which states: "Any 'wrongful act' which is

17  committed over more than one policy period which is insured by us

18  shall be deemed to have taken place during the last policy

19  period...."  Cordell Decl., Ct. Rec. 80, Ex. B at 22.  This

20  provision addresses the circumstance where an act, occurring during

21  the policy period, has triggered multiple years of coverage.

22         The Court finds that neither of the cited provisions of the

23  "Limits of Insurance" section provide a directive regarding the

24  timing of the wrongful acts for purposes of determining when

25  coverage is triggered.  However, these provisions are instructive.

26  Importantly, though related or continuous acts are collapsed into

27

**ORDER** – 29

a single "wrongful act" for purposes of the policy limits, nothing in the policy requires the act to be deemed committed at a single fixed point in time.[7]   The above cited language of the "Limits of Insurance" section is consistent with this notion as it recognizes the circumstance where a wrongful act may have been *committed* over the course of time and policy periods.

Finding case authority to draw upon here is difficult because of the case-specific approach required in coverage disputes.   The Court has reviewed the potentially analogous cases involving insurance disputes wherein coverage was triggered by "acts or omissions" occurring during the policy period. In *Phoenix Phase I Assocs. v. Ginsberg, Guren & Merritt*, 23 Ohio App.3d 1, 3, 490 N.E.2d 634 (1985), a law firm had been found liable by a jury for

---

[7] The Court recognizes that in at least one other case, related wrongful acts were treated as occurring when the first act occurred, even though there was no language in the insurance policy requiring such treatment.  *American Intern. Specialty Lines Ins. Co. v. Continental Cas. Ins. Co.,* 142 Cal.App.4th 1342, 1374 49 Cal.Rptr.3d 1 (Cal.App. 2 Dist. 2006)(holding that there was no coverage for wrongful acts occurring during the policy period because the acts were subsumed into one wrongful act, which was "logically... treated as happening at the start of the chain of events"). Because the *American International* court did not provide a justification for reaching this conclusion, other than its own sense of logic, the Court does not find the case instructive or helpful here.

**ORDER** - 30

malpractice involving a complex real estate transaction which began experiencing problems in 1973 and continued until 1974. There were no findings of fact because the jury returned a general verdict. After the plaintiff sought to enforce the judgment against the law firm's insurance liability carriers, one insurer argued it should not bear any responsibility for the judgment because all of the malpractice had occurred prior to its policy period. However, upon a review of the facts, the court found the law firm's acts of malpractice were ongoing well into its coverage period. *Id.* (wrongdoing occurred both at the time attorney failed to prevent plaintiffs from investing, and at time attorney failed to advise plaintiffs to rescind). Similarly, in *Levine v. Lumbermen's Mutual Casualty Co.*, 149 A.D.2d 372, 538 N.Y.S.2d 263 (N.Y. Sup. Ct. A.D. 1989), the insured law firm's case was dismissed before the policy period, and the law firm neglected to seek to have the dismissal vacated until after the policy period, at which point it was too late. *Id.* at 264. The court held that the failure to seek a vacation of the dismissal was a continuous error, and thus coverage existed because at least some of the malpractice fell within the policy period. *Id.*

The Court finds the timing of the wrongful acts of delay occurring in this case should be treated in a similar fashion to the ongoing or continuous acts of malpractice analyzed in the above referenced cases. Feature's interference claim was based upon allegations of a continuous course of conduct, which merely began with the City's refusal to process the amendment lodged with the

**ORDER** – 31

City in May 1999.  Where, as here, there are repeated and related acts of delay occurring over a period of time, during which the damage incurred from the delay is indivisible and continuous, it is reasonable to deem the act to have been committed continuously for the purpose of determining what insurance policy has been triggered.  *See e.g. Stonewall Ins. Co. v. City of Palos Verdes Estates,* 46 Cal.App.4th 1810, 1849, 54 Cal.Rptr.2d 176 (1996)(the insured suffered loss arising out of a continuous and repeated course of conduct of the City from 1971 to 1981, namely, improper design and maintenance of a City storm drain).

The Court must give a matter-of-fact construction of the language of this insurance policy.  The policy provides in plain, clear words that it provides coverage for any "wrongful act" committed during the policy period.  Furthermore, the policy contains no language suggesting that it limits coverage for allegations of continuous wrongful acts alleged to have commenced prior to the policy period.  Feature has demonstrated that the 2005 settlement with the City was based upon "wrongful acts" e.g. alleged acts of delay (or acts causing delay) committed over a span of several years and occurring well after the commencement of coverage.

**E. "Arising out of" Policy Exclusion**

In its rebuttal brief filed September 22, 2006, USF&G relies upon a new argument to which Feature has not had the opportunity to respond.  In this argument, USF&G attempts to defeat coverage by arguing a policy exclusion applies.  If a claim triggers the

**ORDER** - 32

initial grant of coverage in the insuring agreement, courts next examine the various exclusions to see whether any of them preclude coverage of the present claim.   Ordinarily, the burden is on the insurer seeking to avoid coverage to prove the applicability of an exclusion, *See Aetna Ins. Co. of Hartford v. Kent*, 12 Wash.App. 442, 447, 530 P.2d 672, *reversed on other grounds*, 85 Wash.2d 942, 540 P.2d 1383 (1975).

USF&G relies upon the same policy exclusion interpreted by the Court in USF&G's previous motion for summary judgment.   This exclusion precludes coverage for any claim "arising from the willful violation of any statute, ordinance, or regulation committed by or with the knowledge or consent of any insured." Cordell Decl., Ct. Rec. 80, Ex. B at 19.   This time, focusing on the "arising from" language in this provision, USF&G argues that as a matter of law, there is no coverage for Feature's interference claim because the claim was "exclusively premised...on the City's alleged RCW 64.40 violation," which the Court has previously ruled was not covered.[8]  Ct. Rec. 60 at 16.

Under Washington law, interpretation and construction of insurance coverage language is a question of law, and thus, the

---

[8]  The Court's previous interpretation of this particular policy provision led to the conclusion that this policy exclusion did not generally preclude coverage for common law tort claims. Interestingly, USF&G did not assert the argument now being raised in its previous motion for summary judgment, instead relying upon a public policy argument to attempt to defeat coverage.

**ORDER** – 33

court may properly decide issues regarding the interpretation and construction of an insurance contract on summary judgment. While it appears undisputed that the damages sought under both Feature's RCW 64.40 claim and its interference claim were based upon the same set of operative facts, the insurance policy here does not contain a provision precluding coverage merely because claims have similar factual bases.[9] Rather the exclusion precludes claims *arising from* a willful violation of a statute.

The case relied upon by Feature, *Upsher-Smith Labs, Inc. v. Fed. Ins. Co.*, 264 F.Supp.2d 843, 850 (Minn. 2002), *aff'd*, 67 Fed.Appx. 382 (8th Cir. 2003), is distinguishable. The court in *Upsher-Smith Labs* relied upon a broad construction of the phrase "arising out of" to deny insurance coverage under an antitrust exclusion where the plaintiffs had stated common law causes of action as well. Notably, the language of the antitrust exclusion applied by the court in *Upsher-Smith Labs* utilized far more encompassing language than the policy exclusion at issue here, excluding coverage for all claims "*based upon, arising from, or in consequence of* any actual or alleged violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson-Patman Act of 1936, the

---

[9] It is not uncommon for insurance policies to have provisions which exclude coverage for claims attributable to the same or related wrongful acts. However, to the Court's knowledge, this policy contains no such exclusion.

**ORDER** - 34

Cellar-Kefauver Act of 1950, the Competition Act, the Federal Trade Commission Act of 1914, Amendments thereto, or any other federal, state, provincial, or local statutory or common law designed to prevent monopoly, preclude price fixing, or otherwise protect competition..." *Id.* at 847 (emphasis added). Moreover, the *Upsher* court concluded that the alleged common law causes of action "flow[ed] directly from the underlying antitrust allegations." *Id.* The factual basis for the common law claims was the underlying alleged antitrust *violations*, which were not covered. Essentially, none of the common law claims could be divorced from the antitrust claims.  In this case, USF&G has not demonstrated that Feature's interference claim could not have stood independently of the underlying alleged violation of RCW 64.40.  In fact, Feature's interference claim was not merely an alternative cause of action or afterthought, but a distinct claim based upon similar facts.[10] USF&G is attempting to read an exclusion into the policy which does not exist. The Court will not add words to the language of the contract of insurance to either create or avoid liability.

///

///

_____

[10] As noted by the Court in its previous summary judgment order (Ct. Rec. 60), in at least one reported Washington case, (and in many unreported cases), common law negligence has specifically been pled as an alternative cause of action to RCW 64.40. *See West Coast, Inc. v. Snohomish County*, 104 Wash.App. 735, 741, 16 P.3d 30 (2000).

**ORDER** – 35

### IV. CONCLUSION

Summary judgment declaring a lack of insurance coverage may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. *See Cochran v. B.J. Services Co. USA*, 302 F.3d 499 (5th Cir 2002)(applying Louisiana law). Contrary to USF&G's contention, the undisputed facts do not demonstrate a lack of coverage. Rather, having carefully reviewed all of the facts relating to the events giving rise to the claims against the City and the 2005 settlement, the Court finds that the record demonstrates that a single, continuous "wrongful act" was committed by the City within the USF&G policy period such that its interference claim is within the scope of the policy's coverage. Accordingly, USF&G's Motion for Summary Judgment Re: No Coverage for Tortious Interference (Ct. Rec. 61) is **DENIED**.

**IT IS SO ORDERED**. The District Executive is directed to enter this order and furnish copies to counsel.

**DATED** this 13th day of December, 2006.


 s/ Alan A. McDonald
ALAN A. McDONALD
SENIOR UNITED STATES DISTRICT JUDGE

**ORDER** – 36