UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| In Re:<br><br>FEATURE REALTY LITIGATION | NO.   CV-05-0333-WFN<br><br>ORDER GRANTING FEATURE'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: ALLOCATION; GRANTING IN PART FEATURE'S MOTION RE: COVERAGE LIABILITY; DENYING USF&G'S MOTION RE: POLICY CONDITIONS |

**This Order Also Relates to:   CV-05-0165-AAM; CV-05-0222-AAM**

Before the Court are Defendant Feature Realty's [Feature] Motion for Partial Summary Judgment Re: USF&G's Coverage Liability (Ct. Rec. 122), United States Fidelity & Guaranty Company's [USF&G] Cross-Motion for Partial Summary Judgment for Failure to Satisfy Policy Conditions (Ct. Rec. 136), and Feature's Motion for Partial Summary Judgment Re: Allocation (Ct. Rec. 173).  Having considered the parties' arguments and submissions, and for the reasons set forth below, the Court enters the following order.

## I.  FACTS

This consolidated declaratory judgment action concerns the duties owed under USF&G's excess liability policy issued to the City of Spokane in regards to the 2005 settlement and consent judgment the City reached with Feature relating to the City's

ORDER - 1

alleged delays in the permitting process for the development known as the Canyon Bluffs PUD. The Court will not reiterate the extensive factual and procedural background summarized in the Court's previous summary judgment decisions, familiarity with which is assumed. Additional facts, as necessary, will be related in the Court's analysis of the summary judgment arguments.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c)). In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S. Ct. 435, 93 L. Ed. 2d 384 (1986).

On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. When the moving party will have the burden of proof at trial, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." William W. Schwarzer, SUMMARY JUDGMENT UNDER THE FEDERAL RULES: DEFINING GENUINE ISSUES OF MATERIAL FACT, 99 F.R.D. 465, 487- 488 (1984). In contrast, a moving party who will not have the burden of proof at trial need only point to the insufficiency of the other

ORDER - 2

side's evidence, thereby shifting to the nonmoving party the burden of raising genuine issues of fact by substantial evidence. *T.W. Electric*, 809 F.2d at 630 (*citing Celotex*, 477 U.S. at 323); *Kaiser Cement*, 793 F.2d at 1103-04. In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630-31 (*citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence the parties present must be admissible. FED. R. CIV. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

The parties agree that Washington state law governs this diversity dispute. Under Washington law, insurance policies are construed as contracts, and interpretation of policies is a matter of law. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wash. 2d 477, 687 P.2d 1139, 1141-42 (1984). Policies are to "be given a fair, reasonable, and sensible construction" that comports with how the average purchaser of insurance would view the policy. *Grange Ins. Co. v. Brosseau*, 113 Wash. 2d 91, 776 P.2d 123, 125 (1989). Generally, the burden is on the insured in an action on an indemnity policy to show that the loss suffered comes within the terms of the insurance policy. *Waite v. Aetna Casualty & Sur. Co.*, 77 Wash. 2d 850, 467 P.2d 847, 850 (1970).

### III. DISCUSSION

The Court has previously determined that the terms of the insurance contract relieved USF&G of any duty to defend its insured. Ct. Rec. 31 [Dec. 16, 2005 Order Granting USF&G's Motion for Partial Summary Judgment Re: No Duty to Defend]. However, the question remains as to whether USF&G owes any duty to pay Feature, on behalf of its insured, sums for which the City is legally obligated to pay because of injury caused to

Feature by acts of the City.[1]  In the insurance context, the duty to pay or indemnify exists if the facts of the case demonstrate a right to coverage under the insurance policy.  Now pending before the Court are cross-motions for summary judgment raising numerous issues regarding whether coverage exists under USF&G's excess liability insurance policy issued to the City.

The determination as to whether coverage exists hinges upon 1) whether there is a loss covered under the insuring agreement[2] and if such exists, 2) whether that potential coverage

-------------------

[1]A finding of no duty to defend at time of settlement, does not necessarily foreclose a finding of a breach of a duty to indemnify.  Although it may not be commonplace (though perhaps more common with excess insurers), it is possible for an insurer to limits its duty to defend without simultaneously limiting its duty to indemnify.  *See American States Ins. Co. v. Dastar Corp.*, 318 F.3d 881 (9th Cir. 2003) (interpreting Oregon law); *Chief Industries, Inc. v. Great Northern Ins. Co.,* 268 Neb. 450, 683 N.W.2d 374 (Neb. 2004).  Washington courts have expressly recognized the duty to indemnify as a distinct obligation from the duty to defend.  *Weyerhaeuser Co. v. Commercial Union Ins. Co.,* 142 Wash. 2d 654, 690, 15 P.3d 115 (2000).  The Court also notes that nothing in the USF&G policy language relieves USF&G of its duty to indemnify for losses otherwise within the coverage of the policy and established by a court judgment.  Most relevant here, the Court's decision regarding the duty to defend effects the burden of proof on the issue of coverage.  In a case where an insurer breaches its duty to defend, there is a presumption of coverage and the insurer bears the burden of proof to negate coverage.  Where, as in this instance, no duty to defend exists, the insured (or assignee of the insured) bears the initial burden of demonstrating the potential for coverage exists.

[2] A liability insurance policy consists, generally, of three parts: (1) the insuring agreement, which is the affirmative grant of coverage that sets forth who and what are

ORDER - 4

would be specifically excluded under the exclusions or policy conditions expressed in the City's policy. *Wright v. Safeco Ins. Co. of America*, 123 Wn. App. 263, 270, 109 P.3d 1 (2004). The Court has already issued three separate decisions substantively addressing certain aspects of both facets of coverage. On March 7, 2006, the Court declared that the USF&G policy specifically excludes coverage of the settled statutory claim, rendering Feature's tortious interference claim the only claim included in the settlement and potentially covered by the policy. Ct. Rec. 60. The Court's December, 2006 order interpreted certain language in the insuring agreement to find the underlying tortious interference claim arose from a single, continuous "wrongful act" which "was committed during the policy period." Ct. Rec. 107. Finally, on May 10, 2007, the Court held that coverage was not precluded under the "known risk" doctrine. Ct. Rec. 186.

**A. Contentions of the Parties**. Feature's motion regarding coverage liability against USF&G seeks to have the Court hold that: 1) the right to coverage has been established as a matter of law for the tortious interference claim included in the 2005 settlement with City of Spokane under the USF&G policy; 2) USF&G has a duty to indemnify the City; and 3) USF&G has breached this duty. In response, USF&G has asserted various defenses that it claims preclude coverage of the settlement under the policy. USF&G's cross motion seeks a denial of Feature's motion and a judicial declaration that it has no coverage or indemnity obligation under the USF&G insurance contract with respect to the 2005 settlement. USF&G specifically claims that coverage is precluded by the City's failure to fulfill the policy conditions and thus, USF&G has no duty to indemnify. Furthermore, even if coverage is deemed to exist and the duty to indemnify triggered, USF&G claims it has

covered; (2) the exclusions, which limit the insuring agreement's coverage; and (3) the conditions, which set forth a procedural framework for how the parties will conduct their dealings in the event of a loss.

ORDER - 5

not been breached because it has not yet been required to make payment under the policy. Given that USF&G challenges both elements of coverage here, the Court will address the arguments regarding the insuring agreement first and the affirmative defenses relating to policy provisions last.

**B. The Insuring Agreement and Feature's Prima Facie Case**.  The burden of demonstrating the loss is covered under the insuring agreement falls upon the insured or in this case, the assignee of the insured, Feature.  The relevant portion of the insuring agreement in this case states as follows: ". . . We will pay 'ultimate net loss' on behalf of any insured (including the 'Public Entity') in excess of the 'self-insured retention' for any civil claim because of injury caused by a 'wrongful act' to which this insurance applies."  Ct. Rec. 47, Ex. B [USF&G Policy] at 18.  Furthermore, the insuring agreement provides that coverage only applies if "the 'wrongful act' was committed in the 'coverage territory' during the policy period." *Id.*  Accordingly, in order to prove its prima facie case of coverage, Feature must be able to demonstrate: 1) an "ultimate net loss" in excess of the self-insured retention amounts and 2) the existence of a civil claim because of injury caused by a wrongful act occurring during the policy period.

The Court's December 13, 2006 order addressed only the second element of Feature's prima facie case: whether the act creating liability was a covered event, which, as explained in the order, is only one part of the broader question of whether coverage exists.  The USF&G insurance policy clearly imposes additional requirements before the insurer is required to pay.  That a loss is occasioned by a covered act does not alone mean the insurer is liable, but rather "triggers"[3] the insurance policy (and oftentimes, the duty to defend) and brings the loss within

---

[3]The term "trigger" is not term utilized or defined in the insurance policy itself, but rather is a term of art used to define the event or condition that determines whether or not a policy responds to a specific claim.  As noted by the Court in its December 13, 2006 Order,

ORDER - 6

1    the *potential* for coverage.  USF&G's cross-motion for summary judgment now challenges

2    Feature's ability to demonstrate the first element of its prima facie case:  that Feature has not

3    and can not demonstrate the existence of an "ultimate net loss" or satisfaction of the self-

4    insured retention, and therefore coverage can not exist.

5       **1. "Ultimate Net Loss" and "Legally Obligated to Pay".**  The USF&G policy

6    provides the insurer will pay for "'ultimate net loss' in excess of the 'self insured retention'."

7    Ct. Rec. 47, Ex. B [USF&G Policy] at 17.  The policy defines "ultimate net loss" as "[t]hose

8    sums that the insured becomes legally obligated to pay as damages; and . . . [a]ssociated

9    'claim expenses'." *Id.* at 47-48.  USF&G argues that in this case, the City was never "legally

10   obligated" to pay damages under the terms of its settlement agreement.  The settlement

11   provided that as to the $600,000 cash payment, Feature's sole recourse for collection of these

12   funds was from Lexington Insurance Company.  As to the agreed $5.5 million Consent

13   Judgment, Feature and the City agreed that Feature's sole recourse was against Genesis and

14   USF&G.  The only "payment" the City was obligated to make was $250,000 in "forgiveness

15   of all permit fees that the City would otherwise charge the Plaintiffs."   USF&G argues that

16   because the consent judgment provides an agreement not to execute against the City and

17   permits Feature  to collect the judgment only to the extent that USF&G's insurance provides

18   coverage, the City was never "legally obligated to pay" any part of the judgment, it suffered

19   no insurable loss, and thus that it has no right to indemnification.  Thus, since Feature stands

20   in the shoes of the City, USF&G argues that Feature can not demonstrate the "ultimate net

21   loss" requirement of a prima facie claim for coverage.

22       The question is how the phrase "legally obligated to pay" should be interpreted in the

23   context of a settlement agreement consisting of a consent judgment joined with a covenant

24   _____

25   a finding that a policy has been triggered, however, does not end the inquiry into whether or

26   not coverage exists under that policy.

ORDER - 7

not to execute and an assignment of the insured's rights against the insurer to the injured plaintiff.   USF&G's construction of the policy suggests that an insured protected by a covenant not to execute has no compelling obligation to pay any sum to the injured party; thus, the insurance policy imposes no obligation on the insurer.  Though this construction has been followed by some courts[4], it is clearly the minority view and not the rule followed in Washington.  The vast majority of Courts follow the rule that the insured remains "legally obligated to pay" because a covenant not to execute coupled with an assignment and settlement agreement is a contract and "not a release permitting the insurer to escape its obligation."  *Kagele v. Aetna Life & Cas. Co.*, 40 Wash. App. 194, 198, 698 P.2d 90 (1985); *see also Besel v. Viking Ins. Co. of Wisconsin,* 146 Wash. 2d 730, 49 P.3d 887 (2002); *Steinmetz v. Hall-Conway-Jackson, Inc*., 49 Wash. App. 223, 741 P.2d 1054 (1987); *Safeco Insurance Co. of Am. v. Butler*, 118 Wash. 2d 383, 399 823 P.2d 499 (1992) (holding

---

[4]*See Freeman v. Schmidt Real Estate & Ins., Inc., 755 F.2d 135, 138 (8th Cir.1985); Roach v. Ravenstein's Estate,* 326 F.Supp. 830, 836 (S.D.Iowa 1971); *Stubblefield v. St. Paul Fire & Marine Insurance Co*., 267 Or. 397, 517 P.2d 262, 264 (1973) (en banc); *Bendall v. White*, 511 F.Supp. 793, 795 (N.D.Ala. 1981); *Huffman v. Peerless Insurance Co.*, 17 N.C.App. 292, 193 S.E.2d 773, 774, cert. denied, 283 N.C. 257, 195 S.E.2d 689 (1973).  The courts that have followed this line of reasoning did so out of fear of collusion between the insured and the claimant or by simple reliance on the policy language. *Freeman*, 755 F.2d at 138-39; *Bendall v. White*, 511 F.Supp. 793, 795 (N.D.Ala. 1981); *Steil v. Florida Physicians' Ins. Reciprocal,* 448 So.2d 589, 592 (Fla.App. 1984); *American Cas. Co. of Reading, Pa. v. Griffith*, 107 Ga.App. 224, 227, 129 S.E.2d 549, 551-52 (1963); *Huffman v. Peerless Ins. Co.*, 17 N.C.App. 292, 293, 193 S.E.2d 773, 774, cert. denied, 283 N.C. 257, 195 S.E.2d 689 (1973); *Stubblefield v. St. Paul Fire & Marine Ins*. Co., 267 Or. 397, 400, 517 P.2d 262, 264 (1973).

ORDER - 8

covenant not to execute coupled with an assignment and settlement agreement does not release a tortfeasor from liability; it is simply "an agreement to seek recovery only from a specific asset--the proceeds of the insurance policy and the rights owed by the insurer to the insured"); *Metcalf v. Hartford Acc. & Indem. Co*., 176 Neb. 468, 126 N.W.2d 471, 475-76 (1964); *Coblentz v. American Surety Co.*, 416 F.2d 1059 (5th Cir. 1969) (holding that an insurance company which chose not to defend its insured could not later deny coverage by asserting the 'legally obligated to pay' provision in the policy after the insured reached a settlement where the injured party agreed to collect only against insurance proceeds); *American Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 813 (Ind. App. 1980); *Losser v. Atlanta Intern. Ins. Co.,* 615 F.Supp. 58, 61 (D.Utah 1985); *Auto-Owners Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 547 So.2d 148, 151 (Fla.Dist.Ct.App. 1989) (holding that a covenant not to execute on a judgment against an insured does not negate insurance coverage and stating that 'many courts, including Florida's, look with disfavor on the idea that a covenant not to enforce against one party automatically releases that party's insurance carrier'); *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 529 (Iowa 1995) (holding that a plaintiff's agreement to collect only against a defendant's insurance company was merely a covenant and did not constitute a release of the defendants from liability and stating that the defendant is still "legally obligated" to the injured party, and the insurer still must make good on its contractual promise to pay).

In an attempt to avoid the enforcement of consent judgment here, USF&G contends that this technical construction of the "legally obligated to pay" language only applies where the insurer has a duty to defend.  Though each Washington case on point has in fact involved an insurer with a duty to defend, the Court finds the same rule applies where an insurer rejects its right to defend.  *See Liberty Mut. Ins. Co. v. Wheelwright Trucking Co*., 851 So.2d 466, 490 (Ala. 2002) (holding the insurer waives the protection of the legally-obligated-to-pay condition when it has the right, but refuses to participate in the defense of its insured); *Twin*

ORDER - 9

*City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc*., 480 F.3d 1254 (11th Cir. 2007) (applying *Wheelwright* in non-bankruptcy setting). Indeed in both the instance where the insurer has breached a duty to defend and where it has rejected its right to defend, the insurer has left the insured to its own devices to defend and protect itself. In this case, despite being on notice that Feature had asserted claims against the City in excess of the self-insured retention, USF&G elected not defend or associate in the City's defense. By choosing this course, the insurer is in no position to then hide behind the policy language and challenge the structure of the very agreement its insured had the right to choose. If USF&G's position were accepted, it would defeat the very purpose of the binding settlement and this type of settlement agreement would be invalid and useless. Washington state law clearly views the benefits of such a settlements outweigh their risks. And since the insurer who has the right to defend and elects not to remains free argue collusion or fraud as a defense, public policy supports application of the same rule in this case as well.

Even as a matter of pure contract interpretation, this argument should be decided in favor of Feature. The scope of the term, "legally obligated to pay" is not defined in the policy and is arguably ambiguous, and, as such would have to be construed in favor of the insured. Technically speaking, the assignment did not negate the obligation to pay, but rather limited the assets against which Feature could collect its damages. While practically the City does not face personal risk under the settlement agreement, this fact is immaterial. At the time the City agreed to the settlement, it incurred an obligation to pay. Accordingly, USF&G's contention that Feature can not demonstrate an "ultimate net loss" is rejected.

**2.    Satisfaction of the $250,000 Self-Insured Retention.** USF&G contends it has no duty to indemnify Feature because Feature has not and can not demonstrate that it has satisfied the self-insured retention [SIR] contained in the policy. The USF&G policy provides the insurer will pay for "'ultimate net loss' in excess of the 'self insured retention'," which

ORDER - 10

in this policy, is $250,000 per "wrongful act."  Ct. Rec. 47, Ex. B [USF&G Policy] at 17-18.
A SIR (like a deductible[5]) represents the amount of the loss that the insured is responsible for
before coverage can exist.  Self-insured retention is defined in the policy as:

> . . . the amount shown in the Declarations you must pay under Coverage A and Coverage B for 'ultimate net loss' because of all injury arising out of a 'wrongful act' before our obligation to begin payment commences.  The 'self-insured retention' is not exhausted or diminished by payment of any loss, claim or 'suit' that is not covered by this policy.

*Id.* at 29.

The parties agree the SIR is enforceable and applies here.  They also agree the amount
owed is a single SIR, or $250,000.[6]  Ct. Rec. 166 [USF&G's Reply] at 1-2; Ct. Rec. 154
[Feature's Response] at 17 n. 2 .  The SIR can be depleted by either the payment of those
sums the insured is obligated to pay as "damages" or the payment of "[a]ssociated claim
expenses" which are defined by the policy to mean "payments allocated to a specific claim
or 'suit' for its investigation, settlement, or defense" including, "[a]ttorney fees and all other
litigation expenses", "[a]ll reasonable expenses incurred by the insured in the investigation
or defense of the claim or 'suit'. . . ," and "[a]ll costs taxed against the insured in the 'suit'".
Ct. Rec. 47, Ex. B at 28.

---

[5]Although "self-insured retention" is a term of art with a technically different meaning
from the term "deductible," many cases and commentators use the terms interchangeably in
the circumstances presented here.  *See* Garret G. Gillespie, THE ALLOCATION OF COVERAGE
RESPONSIBILITY AMONG MULTIPLE TRIGGERED COMMERCIAL GENERAL LIABILITY POLICIES
IN ENVIRONMENTAL CASES: LIFE AFTER OWENS-ILLINOIS, 15 Va. Envtl. L.J. 525 (1995-96)
(using the terms "deductible" and "self-insured retention" (SIRs) interchangeably).

[6]This is consistent with the Court's remarks in its December 13, 2006 order and the
language of the USF&G policy, which collapses any series of continuous, repeated or
interrelated 'wrongful acts' into a single "wrongful act." Ct. Rec. 47, Ex. B at 22.

ORDER - 11

1     *a.  Satisfaction of the SIR is a Condition Precedent to Coverage.*  At the outset, the

2   parties first dispute whether the policy requires the insured as a condition precedent to

3   coverage to exhaust or pay the SIR.  While USF&G argues in favor of this concept, Feature

4   contends that instead of an issue of coverage, the SIR should be viewed as a setoff in the

5   calculation of the amount of damages owed.  After reviewing the language of the USF&G

6   policy, the Court finds that the plain language of the policy provides that satisfaction or

7   payment of the $250,000 is a condition precedent to USF&G's obligation to provide coverage

8   or pay damages in excess of the self-insured retention limit.  Where the insurer challenges the

9   insured's ability to satisfy the self-insured retention it becomes a question of coverage rather

10  than simply calculating the amounts owed.

11    *b.  Burden of Proof.*  Although Feature would have the burden at trial of establishing

12  the SIR was met, in order to succeed on summary judgment stage on this defense, USF&G

13  must be able to first demonstrate clear and uncontradicted evidence that the City was legally

14  obligated to pay less than its full SIR in settling. By raising this issue as a defense, it is

15  USF&G's duty to first demonstrate that the City's loss in any given policy period *did not*

16  exceed $250,000, or at least demonstrate the lack of evidence to prove such.  USF&G has not

17  made such a showing and the record establishes the SIR has been met.

18    *c.  Facts and Respective Arguments.*  From 1994-2002, the City was insured through

19  three excess insurance carriers including Lexington Insurance Company (7/1994-7/1995),

20  Genesis Insurance Company (7/1995-8/1999) and USF&G (9/1999-9/2002).  Lexington

21  defended the City under a reservation of rights against all actions brought by Feature from

22  1995 through the settlement in 2005.  The Lexington insurance policy was subject to a SIR

23  of $500,000, which Lexington declared had been satisfied by the City in December, 2000.

24  Ct. Rec. 161 [Preston Decl] ¶ 4.   After December, 2000, Lexington paid at least

25  $1,816,556.22 in attorney's fees in defense of the City, expert fees, court reporter fees, and

26  a $600,000 settlement payment to Feature. *Id.*  Of that amount, over $700,000 was incurred

after January, 2003, when Feature first asserted its claim for interference with a business expectancy.  Ct. Rec. 156 [Feature's SOF in Opposition to USF&G Cross-Motion], ¶ 7.

The parties agree that no expenses paid by the City or Lexington prior to January 31, 2003 can be counted toward satisfying USF&G's SIR.  Feature contends the $250,000 SIR has been more than satisfied by the $5.5 million dollar judgment itself or by Lexington's payment of over $700,000 for the City's outside defense counsel and defense costs for work performed after January 31, 2003.  Feature has submitted the Declaration of Sarah Preston and attached a summary of payments made by Lexington substantiating the payment of defense costs.

USF&G does not contest here that Lexington paid claim expenses after January 31, 2003 associated with the defense of claims involving wrongful acts occurring during the USF&G policy period.  Rather, USF&G contends that Feature has failed to produce any evidence to demonstrate that any of the payments relate to the tortious interference claim, potentially covered under the USF&G policy.  Citing to the policy provisions which only permit recovery for covered events and do not permit exhaustion of the SIR with payments for losses which are not covered by the policy, USF&G contends Feature has the burden of demonstrating what, if any, portion of the settlement or other payments made are traceable to the potentially covered tortious interference claim, as opposed to the non-covered statutory violation claim.  According to USF&G, Feature's failure to segregate the settlement damages or associated claim expenses according to theory of liability is fatal to recovery as Feature can not demonstrate the damages for the tortious interference claim exceed the $250,000 self-insured retention.

Whether Feature has a duty to segregate settlement damages and claim expenses is the subject of Feature's Motion for Partial Summary Judgment Re: Allocation (Ct. Rec. 173).  Generally, allocation issues present questions of the extent of coverage, rather than the existence of coverage.  However, in this case, the Court finds these two issues inseparable.

ORDER - 13

Addressing this particular allocation issue[7], is a necessary prerequisite to resolve the pending summary judgment motions.

d. _Segregation of Damages or Claim Expenses amongst Non-covered and Potentially Covered Theories of Liability is not Required._  The situation before the Court is as follows: Feature has entered into a $5.5 million global settlement with the City which resolved Feature's several theories of liability asserted against the City; it has been determined that only one of the legal theories relied upon is potentially covered; neither the settlement agreement nor the judgment indicate how liability was allocated between them.  This scenario evidently arises with some frequency, but the apportionment of the settlement amounts between covered and non-covered claims is typically resolved through negotiation and private agreement, rather than litigation, as litigation costs can be astronomical.  _Perdue Farms, Inc. v. Travelers Cas. And Surety Co. Of America_, 448 F.3d 252 (4th. Cir. 2006) (citing 4 David L. Leitner et al., Law and Practice of Insurance Coverage Litigation § 47:44 (2005); 1 Allan D. Windt, Insurance Claims & Disputes § 6:31 (4th ed. 2001 & Supp.2005); William H. Black, Jr., COVERAGE CONUNDRUM: POST-SETTLEMENT DETERMINATION OF AN INSURER'S INDEMNITY OBLIGATION, 26 Ins. Litig. Rep. 205, 205, 216 (2004); Davis J. Howard, APPORTIONING AN INSURER'S LIABILITY BETWEEN COVERED AND NONCOVERED PARTIES AND CLAIMS, IN INSURANCE, EXCESS, AND REINSURANCE COVERAGE DISPUTES, 369 PLI/Lit 597, 599, 602, 613 (Barry R. Ostrager & Thomas R. Newman eds., 1989)).

In Washington, the general rule is if a judgment or settlement includes several claims, some of which are covered and others of which are not covered, allocation of the judgment or settlement is allowable when there is a reasonable means of doing so.  Washington courts

_____

[7]The Court notes that allocation is not a singular issue.  This ruling addresses only allocation of the settlement amongst potentially covered and non-covered theories of liability and does not address allocation of liability or responsibility for the settlement.

ORDER - 14

interpreting this rule have defined various circumstances where allocation is not allowable or required. *See Nordstrom, Inc. v. Chubb & Son, Inc*., 54 F.3d 1424 (9th Cir. 1995) (citing cases). The Washington Supreme Court applied this rule in one particularly relevant case, *Public Utility Dist. No. 1 v. International Ins. Co.* ("PUD No. 1"), 124 Wash. 2d 789, 881 P.2d 1020, 1032 (1994). In *PUD No. 1*, the damages arose from a bond default resulting from the abandonment of power plant construction. *Id.* The insured bond holders settled claims of negligence and intentional acts of individuals with the PUDs, who in exchange received an assignment of insurance proceeds. *Id.* Following the settlement the PUDs sought to collect the proceeds from the insurers, who denied coverage. *Id.* One of the questions before the court was whether the trial court erred when it failed to instruct the jury that it must allocate the settlement between the covered negligence and non-covered intentional act claims. *Id.* at 810. The defendant liability insurer argued that the jury should be instructed to allow for allocation of the loss and pay out settlement only for actions that were covered under the policy. *Id.* The court held that the trial court had correctly kept the allocation issue from the jury because both theories of liability were based upon the "same factual core" and likewise, the resulting harm - the financial loss as result of the bond default - was the same for each of the claims and could not be segregated. *Id.*

Feature contends the facts of this case are analogous to those in *PUD No. 1* and allocation should not be required because both claims arose from the same factual core and the same underlying loss - the financial loss resulting from the delay in the processing of the plat amendment. Thus, Feature contends allocating the judgment amongst covered and non-covered theories of liability is impossible since no portion of Feature's damages were uniquely attributable to the non-covered statutory claim. USF&G opposes the motion and claims a question of material fact exists as to whether the settlement damages are indivisible.

The Court agrees with Feature and finds that given the undisputed facts of this case, there is no question of fact and there are no reasonable means of segregating any portion of

the $5.5 million global settlement amongst the potentially covered and non-covered theories of liability. This case is distinguishable from your typical apportionment litigation scenario in many ways. Importantly, this case does not involve a settlement covering distinct causes of action related to different categories of covered and noncovered types of *acts, injuries, or losses.* *See e.g.*, *State Farm v. English Cove Assocs.,* 121 Wn. App. 358, 88 P.3d 986 (2004) (involving covered and non-covered elements of damage); *Employers Mutual Liability Insurance Co. of Wisconsin v. Hendrix,* 199 F.2d 53, 57-59 (insurer not liable for all damages paid in settlement of a claim where some causes of action were beyond the scope of the policy); *Perdue Farms, Inc. v. Travelers Cas. And Surety Co. Of America,* 448 F.3d 252 (4th Cir 2006) (reversing the district court's decision that the insurer was responsible to indemnify the full settlement amount in part because plaintiffs had pursued remedies for two different kinds of injuries, one based on inadequate wage compensation, the other based on insufficient benefit compensation); *Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co.*, 323 N.W.2d 58, 63-64 (Minn. 1982) (distinguishing between the cost of repairing and replacing faulty goods and work, which is a business expense to be borne by the insured, with damage to other property and holding no duty to indemnify covered damage claim of loss of rentals because settlement agreement did not allocate which monies were paid towards that claim). This is not a case involving multiple separate injuries each constituting a "wrongful act" under the policy and some of them covered, some of them not. *See e.g.*, *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1494-95 (5th Cir. 1992)

In this a case, as in *PUD No. 1,* the settlement covered several causes of action which arose from the same factual core and caused a single loss and a single claim for damages. Although the settlement resolved multiple theories of liability, it is undisputed that both counts were based upon the same covered acts and the same harm arising from those acts. Feature's statutory cause of action was not an independent cause of injury, but rather a theory for imposing liability. USF&G attempts to create a question of fact by arguing that the harm

ORDER - 16

here is divisible as an allocation could and should be made between the "extended construction costs" and "lost net profits" factored into Feature's expert's calculation of damages in the underlying case. However, nothing in the USF&G insurance policy prohibits recovery of these damages and both elements of damage are undisputedly recoverable under the potentially covered theory of tortious interference. As it has not been demonstrated that any element of damage is solely attributable to the non-covered cause of action, there is no reasonable basis for allocation. In essence, because there is no evidence that the liability under the statutory claim was any more extensive than the liability under the tortious interference claim, no burden of allocation exists as the damage calculation encompassed only covered items of damages.

Moreover, even assuming the Court could attempt to allocate the loss amongst the covered and non-covered theories, such an endeavor would be arbitrary and would entail pure speculation as to what the parties had in mind when they finalized the global settlement. There is nothing in the record which would even remotely suggest that the City and Feature agreed to the numbers on a per-cause of action basis. Instead the record suggests Feature's expert came up with a dollar figure estimating the loss and the parties' negotiating went from there. USF&G's request for allocation really comes too late: USF&G had every opportunity to impart the importance of allocation of the claims prior to the finalization of the settlement. Instead, USF&G extricated itself from involvement and merely demanded the City provide it with sufficient information to evaluate the claim. Thus, it appears USF&G believed the City should conduct the investigation for USF&G and also do the work of requesting and formulating an allocation. USF&G's failure to apprise its insured of the importance of apportionment is not decisive here, but makes USF&G's position even more unreasonable as applied to the facts of this case.

The Court's conclusion that apportionment amongst the causes of action settled is not appropriate - or even possible - applies to both the settlement and associated claim expenses.

ORDER - 17

Again, there is no evidence that the defense costs incurred can be separated by distinct legal theories, nor would it even make sense to do so in this instance. It is only logical that where a dollar of loss is incurred as a result of both a covered claim and a non-covered claim, the dollar is covered - regardless of the dollar's tangential benefit of settling, or defending against, the non-covered claim.

In sum, the Court finds as a matter of law that allocation of the City's losses amongst covered and non-covered theories of liability is not required under the facts of this case and that Feature's Motion for Partial Summary Judgment Re: Allocation must be granted.[8] There was but a single injury to be compensated based upon acts clearly covered by the policy, notwithstanding Feature's assertion of two distinct theories of recovery. USF&G has offered no authority which would suggest settling parties have the burden of making an allocation amongst theories of recovery based upon a single loss wherein the damages caused are the same. The Court finds this conclusion consistent with *PUD No. 1* and the conclusions reached by numerous other courts. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1433 (9th. Cir. 1995) (applying Washington law and finding total settlement amount was covered under a D&O policy where the uninsured corporation's liability was entirely concurrent with that of its insured directors and officers); *Alexander v. CNA Ins., Co.*, 657 A.2d 1282, 1285 (Pa. App. 1995) (policyholder was entitled to indemnity for the entire amount paid to settle a claim seeking the same damages under alternative covered tort and non-covered breach of contract counts); *Hawthorne v. South Bronx Community Corp.*, 582 N.E.2d 586, 588 (N.Y.

---

[8]In granting Feature's motion, the Court also rejects USFG alternative argument challenging the sufficiency of Feature's pleading of the interference count in the Third Amended Complaint. As the Court has ruled previously, this is not the appropriate context to present a challenge to the merits of Feature's claims settled with the City. *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wash. 2d 789, 881 P.2d 1020, 1032 (1994).

ORDER - 18

1991) (insurer was obligated to pay for the entire settlement of an underlying claim where the policyholder was liable under two alternative theories only one of which fell within the policy's coverage); *Caterpillar, Inc. v. Great American Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995) (settlement of concurrent claims against covered officers and directors and non-covered corporation are covered in their entirety); *Safeway Stores Inc. v. National Union Fire Ins. Co. Of Pittsburgh, Pa.*, 64 F.3d 1282, 1288-89 (9th Cir. 1995) (same); *Reliance Ins. Co. v. Armstrong World Indus., Inc.*, 614 A.2d 642, 657-58 (N.J. Super.L.Div. 1992), rev'd on other grounds, 678 A.2d 1152 (N.J. app. 1996) (insurer had a duty to indemnify policyholder for entire settlement amount in lawsuit seeking the same damages based on covered and uncovered theories); *United States Steel Corp. v. Hartford Acc. and Indem. Co.*, 511 F.2d 96, 99 (7th Cir. 1975) (underlying judgment was covered in its entirety where facts shoed that the policy holder was liable for the same damages under both covered and uncovered claims).

*e.   The Self-Insured Retention has been Met.*  Given this particular allocation of the settlement or claim expenses is not required, the Court rejects USF&G's claim that Feature is unable to demonstrate exhaustion of the SIR.  It is undisputed the SIR is enforceable, the amount owed is $250,000, and that it may be exhausted by payments made by someone other than the insured.  Feature has further demonstrated that it is "legally obligated to pay" a $5.5 million loss and has produced evidence showing that after January, 2003, Lexington paid over $700,000 in expenses associated with the City's defense in the underlying matter.  Given this record, there can be no dispute that USF&G's $250,000 SIR has been met and no issue remains in regards to the SIR.

**3.  Prima Facie Coverage.**  USF&G, as a moving party, has not met its burden of showing no potential for coverage under the insuring clause.  Moreover, the Court finds that Feature has met its burden, as a matter of law, of demonstrating that the loss forming the basis of the 2005 settlement and consent judgment is encompassed by the general coverage provisions of the insurance contract.  Accordingly, USF&G now bears the burden of proving

that a policy exclusion is applicable or that the insured has forfeited the right to coverage because the insurer has been prejudiced by the insured's failure to comply with the policy's conditions. *See Diamaco, Inc. v. Aetna Cas. & Sur. Co.,* 97 Wash. App. 335, 983 P.2d 707 (Wash. App. Div. 1 1999).

**C. Applicability of Policy Conditions/Exclusions**. USF&G's motion also asserts that any potential coverage is precluded under the express conditions of the policy and the City's failure to abide by them. USF&G specifically disclaims coverage and liability on the grounds that the City violated the policy provisions requiring notice and coopera- tion. Under Washington law, the burden of demonstrating non-compliance with notice and cooperation policy provisions is on the insurer. *Pilgrim v. State Farm Fire & Cas.,* 89 Wash. App. 712, 725, 950 P.2d 479 (1997). However, noncompliance with an insurance policy provision does not deprive the insured of the benefits of the policy unless the insurer is also able to demonstrate actual prejudice resulting from the insured's noncompliance. *Northwest Prosthetic & Orthotic Clinic, Inc. v. Centennial Ins. Co.*, 100 Wash. App. 546, 997 P.2d 972 (Div. 1 2000); *Tran v. State Farm Fire & Cas. Co.*, 136 Wash. 2d 214, 961 P.2d 358, 365 (Wash. 1998) (en banc). Both the alleged breach of a policy provision and the prejudice resulting therefrom are generally questions for the trier of fact, unless, of course, there exists no genuine issue of material fact. As the cooperation and notice provisions of the insurance policy are separate and distinct in this case, the Court will analyze them each independently.

**1. Duty to Cooperate.** USF&G contends the City "refused to cooperate with USF&G in its investigation of Feature's claims." Section III of the insurance policy states:

> "We will not be obligated to assume charge of the investigation, defense or settlement of any claim or "suit" against the insured but we will have the right and be given the opportunity to associate with the insured or its Claims Administrator or both, in the investigation, defense or settlement of any claim or "suit" that, in our opinion, involves or appears reasonably likely to involve us. The insured and its Claims Administrator will cooperate with us *when we elect to so associate*."

ORDER - 20

Ct. Rec 47, Ex. B at 21 (emphasis added).  USF&G has not demonstrated any evidence of its association or even inclination to associate themselves in the defense of the claims. Accordingly, USF&G can not invoke the cooperation clause or assert its breach.

    **2.  Duty to Provide Notice and Forward Information.**  The USF&G policy Section V, ¶ 7 contains express conditions entitled "Duties in the Event of Wrongful Act, Claim or Suit."  Among the explicit duties listed are:

    a.    The insured must see to it that we are notified of a "wrongful act" which may result in a claim or "suit" seeking an amount for "ultimate net loss" in excess of the "self-insured retention".  The notice must be made as soon as possible, but no later than 30 calendar days from the date the insured is notified of such "wrongful act". . .

    b.    The first Named Insured shown in the Declarations will furnish us with:

    (1) A quarterly report which provides the following information for each claim or "suit" which was outstanding, opened, revised or eliminated during the previous quarter . . . This report must be furnished no later than thirty (30) calendar days after the end of each quarter.

    (2) Written notification of each claim or "suit" which has, should have or is likely to have, without regard to liability, a reserve equal to or exceeding thirty-three and one third percent (33 1/3 %) of the "self-insured retention".  Written notice must be provided as soon as possible, but no later than fifteen (15) calendar days from the date the insured has sufficient knowledge of facts surrounding each claim or "suit" which could put it on notice that such reserve or payment is indicated.  Complete files on such claim or "suit" must be given to us within thirty (30) calendar days from the date we request such files.

    (3) Other claim information or reports as requested by us from time to time.

    c.    The "Public Entity" or any other involved insured must:

    (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit" or action involving a sum in excess of insureds "self-insured retention"; . . .

    (4) Furnish us and direct defense counsel or others to furnish us with information we may request to evaluate the "wrongful act" or coverage under the policy; . . .

ORDER - 21

1   Ct. Rec. 47, Ex. B at 24-25.

2       USF&G alleges the City did not comply with ¶ 7.a..  Paragraph 7.a. requires insureds

3   to give notice of "wrongful acts"[9] which could give rise to a claim seeking an amount in

4   excess of the self-insured retention.  Paragraph ¶ 7.a. is triggered when the insured becomes

5   aware of a "wrongful act" that might reasonably give rise to liability covered by the policy.

6   This language leaves room for interpretation and differences of opinion as to whether a

7   particular event is wrongful and could lead to a claim/suit under the policy.  Thus, in order

8   succeed on its defense under the notice of wrongful act provision of the policy (¶ 7.a.),

9   USF&G must be able to establish:  1) a "wrongful act" (as defined by the USF&G policy)

10  occurred; 2) the City was aware of the act; 3) the City should have reasonably concluded that

11  USF&G's excess insurance could be implicated in the event of a claim or suit based upon the

12  act; and 4) the City failed to give notice "as soon as possible" or "30 calendar days" from the

13  date the City was informed of the act.

14      USF&G alleges the City violated ¶ 7.a. by:  1) failing to provide notice within 30 days

15  of Feature's suit filed in November, 2000 in Spokane County Superior Court to enforce the

16  first settlement agreement; 2) failing to provide notice of Feature's claims for damages filed

17  with the City Clerk's Office in December, 2001 and January, 2002; 3) failing to provide

18  notice/copies of Feature's Second Amended Complaint (filed on February 15, 2002 and

19  adding a claim for negligent misrepresentation) and the City's Answer (filed March 19, 2002)

20  until July, 2002; 4) failing to provide notice of Feature's complaint (filed January 29, 2003

21  and alleging the City improperly delayed approval of a plat amendment for the Canyon Bluffs

22  _____

23      [9]The term "wrongful act" is defined as "any actual or alleged error or misstatement or

24  misleading statement or act or omission or neglect or breach of duty including misfeasance,

25  malfeasance and nonfeasance by any insured . . . ."  Ct. Rec. 47, Ex. B at 30 (emphasis

26  added).

1   PUD) until April 4, 2003; and 5) failing to provide notice of Feature's Third Amended

2   Complaint (filed October, 2003 and adding claim for tortious interference) until December 12,

3   2003. However, USF&G has not demonstrated how these events demonstrate noncompliance

4   with ¶ 7.a.  While in most cases, the event that triggers the insured's duty to provide notice

5   of acts or occurrences to the insurer is clear (for instance, when the insured is involved in an

6   accident), this case is far more complex and requires consideration of the policy definition of

7   "wrongful act," which USF&G has not performed.  It is the litigant's duty to demonstrate how

8   the facts apply to the language of the contract.  USF&G can not succeed on this defense

9   without applying the facts to the language of the policy and resolving the primary question

10  of the time when the insured is to be charged with knowledge that there had been a "wrongful

11  act" which could lead to a claim or suit implicating the USF&G policy.

12       Though USF&G has proceeded under ¶ 7.a., ¶ 7.b.2. seems to more aptly comport with

13  USF&G's complaints of the lack of notice following Feature's filing of suit, statutory claims,

14  and amended complaints.  This provision requires prompt notification of any claim or "suit"

15  once the insured has sufficient knowledge of the facts surrounding such claim or suit which

16  could put it on notice that it is likely to have a reserve equal to or exceeding thirty-three and

17  one third percent (33 1/3 %) of the self-insured retention.  USF&G also claims the City

18  violated  ¶ 7.b.1., ¶ 7.c.1., and ¶ 7.c.4.,  requiring the City to forward information associated

19  with the claims and suits filed against the City.  All of these provisions require prompt action

20  demanding notice of claim or suit  "as soon as possible" and the "immediate[]" forwarding

21  of copies of legal papers served in connection with any claim or "suit." *Id.*

22       The Court will not describe here every alleged failure to provide notice of claim/suit

23  or forward legal papers occurring over the course of five to ten years of litigation.  The

24  parties' statements of fact provide an undisputed timeline of the years of relevant legal filings

25  by Feature and communications between the City and USF&G during that time.  In short,

26  USF&G contends the City violated the notice requirements of the insurance policy on

ORDER - 23

numerous occasions beginning in November, 2000, when Feature filed suit against the City in Spokane County Superior Court seeking to enforce the 1998 settlement agreement, until April, 2005, after the consent judgment was entered and USF&G had full and unfettered access to the City's documents.  It is undisputed the City first notified USF&G of Feature's claims on July 10, 2002 by letter from retained counsel.  Ct. Rec. 160, Ex. A.  The letter provided a copy of the Second Amended Complaint (filed in February, 2002) and requested USF&G's participation in the defense and indemnification of the City.  The letter also explained that the City had been advised by Lexington Insurance to place USF&G on notice because the allegations in the amended complaint alleged Feature had suffered damages during the USF&G policy period.  *Id.*  The next communication was a reservation of rights sent by USF&G to the City on December 27, 2002.[10]  The potentially covered tortious interference claim for which coverage is sought in this case, was not asserted by Feature until October 3, 2003 as part of the Third Amended Complaint, which was provided to USF&G in December, 2003.

After reviewing the record, the Court finds it arguable whether the City substantially complied with the notice of claims or suit provisions of the policy.  Although ¶ 7 requires various notices be given "immediately", "as soon as possible", or no later than within a specific time frame of 15-30 days, generally these types of requirements are construed as imposing a requirement of reasonable notice under the circumstances of the case or substantial compliance.  WILLSTN CN § 49:109; *Tran v. State Farm Fire and Cas. Co.*, 136 Wash. 2d 214, 228, 961 P.2d 358 (1998); *Sears, Roebuck & Co. v. Hartford Acc. & Indem.*

---

[10]The Court notes copies of the reservation of rights letters have not been supplied, though the Declaration of Manuel Suarez submitted by USF&G indicates such letters were issued and includes partial quotes from them.

ORDER - 24

*Co.,* 50 Wash. 2d 443, 452, 313 P.2d 347 (1957). Thus notice slightly beyond the required time set by the policy does not necessarily constitute a breach.

In this case, the claims for which coverage is sought do not relate to the factual allegations in the November, 2000 action or in the Second Amended Complaint filed in the 1995 action. They pertain to the Third Amended Complaint filed in October, 2003, fifteen months *after* USF&G had been notified of the pending suit. USF&G was provided a copy of the Third Amended Complaint two months after it was filed. Moreover, although USF&G argues it should have been notified when the 1995 and 2000 lawsuits were filed, the policy does not require notice of *every* claim or suit filed against its insured. The language of the policy logically requires notice of those claims or suits which could potentially implicate the USF&G policy.[11] Because the parties did not discuss this specific issue, it is not clear from the record when the City had sufficient knowledge of the facts surrounding each claim or "suit" such that it should have been aware that its excess insurer ought to be notified. However, the July 10, 2002 letter from the City's claims administrator provides some insight:

> Because this contract dispute arose out of the original claim IN 1995 for which the settlement agreement at issue was created, we felt that the claims of Feature Realty were part of that original claim. That claim has been

---

[11]This interpretation of the policy is supported by the policy's definition of "suit" as a claim for damages "*to which this insurance applies.*" Ct. Rec. 47, Ex. B at 12. The term "claim" is not a defined term in the policy, however its inclusion in addition to the term "suit" contemplates assertions of the insured's liability that are not contained in an actual suit. 13 COUCH ON INSURANCE 3D § 191:19 (1999) (Generally, "[u]nless the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability, virtually any assertion of exposure to liability within the risk covered by [the] insurance policy is a potential claim.")

ORDER - 25

defended by Lexington Insurance Company.  Lexington's representative, Sarah Preston, has recommended that we place carriers on notice for the period of 4/98 through 10/01 because of the allegations [in the Second Amended Complaint]  made by Feature Realty that they suffered damages during that period of time.

Ct. Rec. 160 [Swartling Decl.], Ex. 8 (emphasis in original).  In this case, Lexington's advice could be the triggering event as to the City's obligation to give USF&G notice, in which case the City appears to have substantially complied when it informed USF&G in July.

As to USF&G's claims the City violated its duty to forward legal papers, to provide reports, and to provide requested information as required under ¶ 7, the Court will generally note that this is not a case involving an absolute failure of the insured to forward pleadings and documents to the insurance company.  The record reflects the City sent USF&G documents and/or pleadings on at least nine occasions prior to the entry of the consent judgment.  In addition, in June, 2003, the City's retained litigation counsel advised USF&G by letter that his firm had "most of a file room full of documents in this matter", but that it should let him know if it needed additional pleadings or documents.  Ct. Rec. 160 [Swartling Decl.], Ex B.  In January, 2005, counsel for USF&G actually visited the office of the City's litigation counsel to review pleadings, testimony, exhibits and other documentation in the files.  Judging from the timeline of letter and document exchanges between USF&G and the City, there appears, at times, to be a failure of reasonable diligence to timely seek *or* produce information related to Feature's claims.  Accordingly, a question of fact exists as to whether the City's tenders substantially complied with ¶ 7.

However even USF&G could demonstrate the City did not comply with the notice requirements of the policy, in Washington, the failure to provide timely notice is not alone sufficient to excuse performance by the insurer.  After all, the purpose of the notice provision is not to provide a technical escape hatch for insurer to deny coverage, but rather  to prevent the insurer from being prejudiced in its ability to investigate and defend against claims seeking coverage under the policy.  The insurer bears the heavy burden of demonstrating

actual and substantial prejudice.  To establish actual prejudice, the insurer must demonstrate "some concrete detriment resulting from the delay which harms the insurer's preparation or presentation of defenses to coverage or liability." *Canron v. Federal Insurance Company*, 82 Wash. App. 480, 486, 918 P.2d 937 (1996), review denied, 131 Wash. 2d 1002, 932 P.2d 643 (1997).  Claims of actual prejudice require "affirmative proof of an advantage lost or disadvantage suffered as a result of the [breach], which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability." *Canron*, 82 Wash. App. at 491-92, 918 P.2d 937.  Whether interference with the insurer's ability to evaluate and investigate a claim has caused actual prejudice is ordinarily an issue of fact. *Tran v. State Farm Fire & Cas. Co.*, 136 Wash. 2d 214, 228, 961 P.2d 358 (1998).

USF&G claims the City's late, delayed, and inadequate notice prejudiced USF&G by denying it: 1) the opportunity to meaningfully participate in mediations which took place; 2) the opportunity to meaningfully participate in the reasonableness hearing; 3) the ability to adequately evaluate coverage prior to the entry of the consent judgment; and 4) the ability to adequately evaluate whether it should associate in the defense of the City.  Ct. Rec. 138 [Suarez Decl.], at 7-9.  USF&G's evidence is insufficient to demonstrate actual and substantial prejudice as a matter of law.  Specifically, USF&G has not demonstrated how any of the above alleged detriments resulted in any detrimental effect or lost advantage in its ability to evaluate coverage or present its defense.  This is not, for example, a case where the insurer did not receive notice until after the judgment was entered.  Indeed. USF&G received actual notice of Feature's breach of contract and misrepresentation claims asserted in the Second Amended Complaint in July, 2002, nearly three years prior to the entry of the consent judgment and well over one year prior to the assertion of the claims for which coverage is sought.  After receiving notice of the Second Amended Complaint and having been requested to participate in the defense of the City, there is no evidence USF&G took *any action* until five months later when it issued reservation of rights letters declining coverage.  Even after

the City provided USF&G with notice of Feature's Third Amended Complaint and again requested USF&G's defense, indemnification, and attendance at the upcoming mediation, once again, there is no evidence USF&G took any action until *five months* after receiving such notice, when it again issued a reservation of rights letter continuing its denial of coverage.   An insurer cannot assert prejudice with regard to its ability to conduct an investigation that it never even tried to conduct.  *See e.g*., *Country Mutual Insurance Co. v. Kuzmickas*, 2 Ill.App.3d 313, 276 N.E.2d 357, 359-60 (1971) (insurer could not claim that it was prejudiced by delay in notification where there was no evidence that it had made any sort of investigation after it did receive notification).

In addition, USF&G has not alleged, nor is there any suggestion or inference that can be drawn from the evidence, that had USF&G received more prompt notice, it would have handled the claim any differently, changed its decision on coverage, or opted to defend or associate in the City's defense.  There is no evidence of record suggesting USF&G showed any desire to or even inclination to associate in the City's defense.  Moreover, although USF&G contends its ability to evaluate coverage was hindered by the lack of information, USF&G has not identified or described what specific information it was denied or refused, thus the Court can not judge whether the information was material.  *See e.g., Tran v. State Farm Fire and Cas. Co.,* 136 Wash. 2d 214, 961 P.2d 358 (1998) (insured refused to provide material financial and tax records to the insurer resulting in prejudice).

The above facts do not lend themselves to the conclusion that USF&G was denied the opportunity to become involved in the underlying case, had it chosen to do so.  Up to this point, USF&G has consistently taken the position that it had no obligation to defend and the underlying wrongful acts were not covered.  There is nothing in the record to suggest that more prompt or thorough notice of Feature's claims would have changed anything, other than to hasten USF&G's denial of coverage.  USF&G can not claim to have suffered prejudice from its own decision not to participate in the City's defense after notice and opportunity.

Even if USF&G disputed its duty to provide coverage, it could have associated in the defense of the City and then participated more in settlement discussions and the reasonableness hearing, under a reservation of rights.  USF&G has not presented sufficient evidence to demonstrate that any delay in notice has actually and substantially prejudiced the insurer as a matter of law.  Accordingly, the Court will not grant USF&G summary judgment based on lack of notice and resulting prejudice.

**3.  Failure to Disclose Knowledge of Feature's Claims.**  USF&G also contends coverage is precluded under Section I.C(4)[12] because the City knew of and failed to disclose the City's "wrongful acts" prior to the inception of the policy. This argument is the same argument rejected by the Court on in its order on USF&G's Motion for Partial Summary Judgment Re: No Coverage Under Known Risk Doctrine.  For the reasons stated in the previous order, the Court also rejects the argument here.

## IV.  CONCLUSION

Feature's Motion for Partial Summary Judgment re: USF&G's Coverage Liability has caused USF&G to raise its remaining coverage defenses.  Given the framework of the parties' cross-motions for summary judgment, the Court finds the issue of whether the insurance policy provides or precludes coverage is a dispute which can now be resolved by summary adjudication.  For the reasons set forth above, the Court concludes that the language of the insuring agreement does not provide a basis for USF&G to deny coverage and Feature has demonstrated as a prima facie matter that the settlement of the tortious interference claim is

---

[12]This provision provides that coverage will only apply if  "[a]t the time the 'Public Entity' applied for this insurance, it or any other insured had no knowledge of any claim or 'suit' or of any 'wrongful act' which might reasonably be expected to result in a claim or 'suit', except as the 'Public Entity' had reported to us in writing at the time it so applied."  Ct. Rec. 47, Ex. B. at 36.

ORDER - 29

a covered loss under the USF&G policy.  In addition, USF&G's allegations are insufficient, as matter of law, to raise a genuine dispute, on motion for summary judgment, as to whether coverage is precluded by any other policy exclusion or provision.  Specifically, USF&G has failed to offer evidence that it suffered actual and substantial prejudice from its insured's alleged lack of cooperation and delay in providing notice.  The Court concludes that there is no material issue of fact as to whether the USF&G policy provides coverage for the City's settlement of the tortious interference claim.  Accordingly, the Court partially grants Feature's Motion for Partial Summary Judgment re: Coverage Liability.  At this time, the Court denies the remainder of Feature's motion requesting the Court declare that USF&G has a duty to indemnify and has breached this duty, though these issues may be revisited at a later date or when ruling upon the related pending motion regarding whether USF&G should be collaterally estopped from challenging the reasonableness of the underlying settlement.  That motion will be decided by separate order.  Accordingly,

**IT IS ORDERED** that:

1.  Feature's Motion for Partial Summary Judgment Re: Allocation, **Ct. Rec. 173**, is **GRANTED**.

2.  Feature's Motion for Partial Summary Judgment Re: USF&G's Coverage Liability, **Ct. Rec. 122**, is **GRANTED IN PART**, and **DENIED IN PART**.

3.  United States Fidelity & Guaranty Company's [USF&G] Cross-Motion for Partial Summary Judgment for Failure to Satisfy Policy Conditions, **Ct. Rec. 136**, is **DENIED**.

The District Court Executive is directed to file this Order and provide copies to counsel.

**DATED** this 25th day of July, 2007.

s/ Wm. Fremming Nielsen
WM. FREMMING NIELSEN
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 30